**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 701 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | 07/10/2014 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at No. CP-51-CR-0936052-1991 |
| | : | |
| | : | SUBMITTED: July 1, 2015 |
| WILLIAM A. JOHNSON, | : | |
| | : | |
| Appellant | : | |


*Justice Wecht delivers the Opinion of the Court, except with respect to Part IV(D). Justices Baer and Dougherty join the opinion in full. Justices Todd and Donohue join the opinion, except with respect to Part IV(D), and Justice Todd files a concurring opinion, joined by Justice Donohue. Chief Justice Saylor joins Parts I, II, III, and IV(A), (E) and (F) of the opinion and files a concurring opinion.*


**OPINION**


**JUSTICE WECHT**                                    **DECIDED: June 20, 2016**

In this capital case, William Johnson appeals the lower court's denial of his petition for post-conviction relief and denial of an evidentiary hearing on that petition.[1] Johnson raises seven claims. As to the latter six of those listed issues, Johnson has not demonstrated that he is entitled to relief. In a portion of the first of his seven issues, Johnson alleges that trial counsel was ineffective for failing to investigate, discover, and

---

[1]     Johnson's petition was filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46.

present two alibi witnesses at trial. With respect to that claim alone, Johnson has demonstrated that a genuine issue of material fact exists such that the PCRA court should have held an evidentiary hearing. Hence, we vacate the PCRA court's order on that claim, and we remand this case to the PCRA court for an ineffectiveness hearing on the alibi issue alone.

## I. Background

To resolve Johnson's post-conviction issues, we first must provide a detailed description of the facts that were developed at his 1992 murder trial, as well as a recitation of the relevant procedural events that preceded this opinion. In 1991, the Commonwealth charged Johnson with first-degree murder, 18 Pa.C.S. § 2502(a), criminal conspiracy, 18 Pa.C.S. § 903, possessing an instrument of crime, 18 Pa.C.S. § 907, and recklessly endangering another person, 18 Pa.C.S. § 2705. Those charges concerned the June 10, 1993 homicide of John McDonald on a street in Philadelphia. The Commonwealth filed similar charges against Robert Holmes and Lamont Bruce. The three defendants were tried together before a jury.

The following is a summary of the relevant evidence presented by the Commonwealth at Johnson's capital jury trial.

During the early morning hours of June 10, 1991, Sonya Carr, who was engaged to be married to the victim John McDonald, was talking to, and listening to music with, Nancy Jennings, Paul McDonald (the victim's uncle), Al McDonald, and two individuals named Billy[2] and Rocky on the porch of 4837 Marion Street in Philadelphia. Some of

---

[2] As we noted in our opinion resolving Johnson's direct appeal, Billy and Johnson (whose first name is William) are not the same person. We explained that "all of the witnesses who observed the incident on the porch testified that Billy and [Johnson] were different people. Neither Billy [n]or Rocky were further identified at trial." Commonwealth v. Johnson, 668 A.2d 97,100 n.8 (Pa. 1995).

the individuals in this group were drinking beer. Carr did not know the surnames of Billy or Rocky. At one point during the gathering, the home's electrical power suddenly went out. Paul McDonald went inside and then downstairs to flip the tripped circuit breaker back into the on position. Carr explained at trial what happened while Paul McDonald was inside the house:

> We were talking on the porch and we were listening to music, and Billy grabbed my butt. Billy was trying to blame it on Rocky, and Rocky knew that Billy did it and I knew that Billy did it and I told Billy, no, that's violating me and not to do it, and Paul McDonald also told him not to do it.

Notes of Testimony ("N.T."), 5/27/1992, Vol. I, at 54. Upset by the incident, Carr went inside the house. Paul McDonald, the victim's uncle, came back outside and spoke to Billy about the incident. Billy denied that he had touched Carr. He accused Rocky of being the culprit.

The victim arrived at the residence a short time later. Carr met the victim at his vehicle and explained what had happened on the porch. Visibly angered, the victim told Carr to get into the vehicle, and the two drove up and down the street looking for Billy and Rocky.

The victim found Rocky nearby and chased him until Rocky ran into a nearby house. Lamont Bruce (also known as Wayne), who was one of Johnson's co-defendants, approached the victim and told him that his aggressive and accusatory behavior was disrespectful to Bruce's aunt, who apparently owned the residence into which Rocky had fled. The victim explained that he did not mean to be disrespectful, but that he only wanted to locate the person who had touched Carr inappropriately. Bruce grew angrier, and stated that "I am going to have to have you knocked off." N.T., 5/28/1992, at 6.

The victim returned to his vehicle and retrieved a car phone. As he walked, the victim saw Billy and confronted him, threatening Billy with physical violence if he

touched Carr again. N.T., 5/27/1992, Vol. II, at 81. The victim and Billy immediately began arguing about whether Billy had touched Carr's buttocks. Billy denied fondling Carr. The victim removed the chain that he was wearing around his neck and the rings on his fingers, acts that the people on the aunt's porch recognized as a step in preparation for a fight. Paul McDonald pulled the victim away to prevent the fight that was about to ensue. Billy then fled the scene.

Bruce remained at the scene and continued to argue with the victim, repeating his prior assertions that the victim was being disrespectful by being aggressive on his aunt's porch. The victim went to his vehicle and removed a two-by-four piece of lumber from the trunk, placing it under his car. Bruce, believing that the victim was going to the car to retrieve a weapon, stated that "this nigger wants to die tonight." Id. at 53. By this point, someone had called the police, who had arrived in a marked police van. Paul McDonald and his brother-in-law, Ardell McDaniel, took the victim a few houses away to talk to the police. After that discussion, the police left the scene.

Soon after the police departed, Carr looked toward the parking area of a Pep Boys automotive service station and noticed a white Chevrolet Blazer in the empty lot. She also noticed Johnson and Robert Holmes, another of Johnson's co-defendants, walking from the Blazer toward Bruce, who was on the porch of his aunt's nearby residence. Johnson and Holmes talked to Bruce for a brief period, and then approached Carr and Jennings. One of the men yelled out to Carr, "where is your punk boyfriend now?" Id. at 56. Jennings sent for Paul McDonald, believing that something dangerous was afoot.

Ardell McDaniel arrived first. Holmes asked if Ardell McDaniel was one of the people involved in the earlier argument. Someone yelled out that he was not one of them. One of the men in the Johnson-Holmes-Bruce group then yelled to Carr and

Jennings that "he didn't give a fuck about [the victim's] bitch, and the man was going to die tonight." N.T., 5/27/1992, Vol. I, at 59. Carr then took the radio that the group had been listening to into the house at 4837 Marion Street, so that she and Jennings could go inside and shut the door and windows. When she came back outside, she saw Paul McDonald walking back towards the 4837 Marion Street house with the victim walking behind him. When Paul McDonald arrived, Holmes and Bruce were standing nearby. Some witnesses reported seeing Holmes brandishing a gun. Bruce told Paul McDonald that he hoped that the victim would die. Paul McDonald responded by telling Bruce that the victim had calmed down, and that violence was unnecessary. The victim then arrived at the residence. Notably, all of the Commonwealth's witnesses, including police officers who had interacted with him, stated that the victim had calmed down by this point and just wanted to resolve the situation. Nonetheless, Johnson ran between two parked cars and fired approximately six shots at the victim. Johnson, Holmes, and Bruce then ran from the scene.

Meanwhile, Carr had reentered the house to take the radio upstairs, whereupon she heard gunshots. She ran outside, and saw the victim fall to the ground. People scattered from the scene, and Carr saw a group of men running toward the white Blazer.

Carr did not see anyone fire the shots, nor did she see anyone carrying a gun. Two days after the shooting, in an attempt to have Carr identify the men involved in the victim's death, police detectives provided Carr with two envelopes, each of which contained eight photographs of black men. Carr was unable to make any positive identifications from the photographs. However, during her trial testimony, Carr identified Johnson, Bruce, and Holmes as the perpetrators of the murder.

Nancy Jennings, who was Paul McDonald's wife and the victim's aunt by marriage, had departed the scene after the victim and Billy argued about whether Billy had touched Carr's buttocks. Jennings returned when she saw the white Blazer pull into the Pep Boys lot. She testified at trial that she saw Johnson move between two parked cars and shoot the victim. She immediately ran into the residence and called the police. Initially, Jennings had told the police that Bruce shot the victim. Later, Jennings selected the three defendants, Johnson, Bruce, and Holmes, from photographs provided to her by the police.

Notwithstanding her previous identification of Bruce as the shooter, Jennings was confident at trial in her identification of Johnson as the shooter, because she knew Johnson from the neighborhood for approximately twelve years. Jennings testified that she had named Bruce only because she was in a state of shock, which caused her to speak too quickly when interviewed by the police. At trial, Jennings also identified Bruce and Holmes as Johnson's cohorts on the night in question. She testified that Holmes was carrying a gun when the trio returned to the scene immediately before the shooting occurred, but that she never saw Bruce with a gun. Paul McDonald also selected all three defendants from police photo arrays shortly after the shooting, although he had seen Johnson only for a matter of seconds.

Francis Bruce, who was biologically unrelated to Lamont Bruce but nonetheless considered him to be a brother, also was at the scene of the murder, although she did not arrive there until after someone had touched Carr's buttocks. She knew each of the defendants in various ways for a number of years. Francis Bruce identified Johnson as the person who shot the victim. She also selected Johnson's picture from a photo array shortly after the murder. However, Francis Bruce, an admitted crack cocaine addict, had been smoking the narcotic earlier on the day of the murder. Despite being a crack

addict and despite having smoked it that day, Francis Bruce claimed at trial that she was not high when the victim was shot. After the murder occurred, Francis Bruce testified, she smoked more crack cocaine.

Ardell McDaniel, who had been drinking alcohol earlier in the evening, was standing only a few feet from the victim when the shooting occurred. McDaniel identified Johnson as the shooter, although he also had seen Johnson only for a few seconds prior to the shots being fired. McDaniel followed Johnson and the other men after they entered the white Blazer and fled. Eventually McDaniel stopped trailing the Blazer, because someone in the vehicle began firing shots at him. Later, McDaniel was unable positively to select Johnson's photograph from a police photo array. However, McDaniel was able to narrow the photographs to two (from eight), and selected Johnson as the person who looked "the most familiar of the men involved in the shooting." N.T., 6/1/1992, at 31.

On the date in question, a Philadelphia Police Officer named, memorably, Benjamin Franklin was dispatched in the early morning hours to 4837 Marion Street to respond to an emergency call. When Officer Franklin arrived, a large crowd of people had congregated around the residence. Officer Franklin immediately noticed the victim lying in front of 4835 Marion Street. Officer Franklin observed that the victim was bleeding from the stomach area.

Officer Franklin received preliminary reports at the scene from various witnesses. He quickly learned that the victim had been arguing with another black male prior to the shooting after the black male had groped the victim's fiancée's buttocks. Officer Franklin first spoke to Paul McDonald. Paul McDonald told Officer Franklin that, soon after the argument, the alleged groper went into a nearby house, whereupon a different black male arrived on the scene in a white vehicle. This newly arrived person,

described by Paul McDonald as a black male with a light complexion, a heavy build, and approximately five feet seven inches tall, exited the white vehicle, approached the victim from the rear, fired several shots at the victim from a handgun, and then reentered the vehicle and drove away.

Ardell McDaniel also approached Officer Franklin at the scene of the crime. He told the officer that he had followed the white vehicle and that one of the occupants of that vehicle had fired numerous shots at him. He told Officer Franklin that he followed the vehicle all the way to Penns Grove Street, where he saw the shooter and four other individuals exit the vehicle and flee the area on foot.

When Detective William Schol, assigned to the Philadelphia Police Department's homicide unit, arrived at the scene, the victim already had been taken to a local hospital. Detective Schol first observed a bullet strike mark on the front door. Detective Schol located a bullet directly below the strike mark, as well as shell casings on the sidewalk in front of 4837 Marion Street and the neighboring residences. The casings all were fired from the same weapon. During the autopsy, five bullets were removed from the victim's body. All five of those bullets were fired from the same gun.

A silver Mercedes, with a blown-out passenger side window, was parked near the murder scene. As the investigation unfolded, Detective Schol learned that the suspects may have fled the scene in a white Chevrolet Blazer. A few blocks away, at 4124 Penns Grove Street, Detective Schol located the Blazer.

Officer Joanne Beres, from the Mobile Crime Detection Unit, examined the Blazer for latent fingerprints. Officer Beres was able to lift twelve prints from the vehicle. Eugene Famiglitti, an expert in fingerprint identification from the Philadelphia Police Department's Fingerprint Identification Unit, received the lifts obtained by Officer Beres and compared those lifts with the known fingerprints of the three co-defendants.

Famiglitti was able to match some of the fingerprints to Holmes to a reasonable degree of certainty. However, Famiglitti could not match any of the fingerprints lifted from the Blazer with either Johnson's or Bruce's fingerprints.

Detective William Wynn, assigned to the Philadelphia Police Department's Major Crimes Division, was ordered by the trial court to construct a live line-up that included Holmes and Johnson.[3] The purpose of the line-up was for Paul McDonald to identify the individuals who were involved in the murder. Paul McDonald was brought to the police station and sequestered in a room. In the meantime, counsel for Holmes and Johnson met with their clients, and then with Detective Wynn. After consultation with their clients, the attorneys produced sworn statements from Holmes and Johnson indicating that they refused to participate in the line-up process, including in the selection of the stand-in volunteers that comprised the remainder of the line-up. As a result, the line-up was canceled. Johnson did not offer any reason at that time as to why he would not participate, and his attorney did not proffer any reasons at trial.

With that evidence, the Commonwealth rested. The defendants presented the following witnesses, who portrayed the victim as uncontrollable and as the aggressor in each confrontation.[4]

Sarah Morris lived on Marion Street at the time of the shooting. She had been sitting on her steps with her son when she heard an argument between the victim and two other people whom she could neither see nor identify. During the time that Morris observed the argument, the victim acted aggressively and abusively. He repeatedly

---

[3]     At trial, the court refused to permit the witness to testify as to who requested the line-up. The trial court believed that the jury only needed to know that the line-up was ordered by the court.

[4]     All of the defense witnesses were called as fact witnesses by Lamont Bruce.

used foul language and insulted the neighbors and the neighborhood. Morris saw the victim go to his car and retrieve an item from his trunk, although she could not identify the item. Morris then felt that she had seen and heard enough to convince her that something violent or dangerous was afoot. She went inside her house and called the police, who arrived shortly thereafter. Once the police left, Morris went back inside her residence. A few minutes later, she heard gunshots. When Morris went outside, she saw the victim on the ground. Morris knew Bruce, but did not see him in or around the area where the murder occurred. She also did not see Johnson or Holmes at the scene of the murder.

Jody Morris, Sarah Morris' son, was inside his house when he heard the victim arguing with "a guy by the name of Bill," on Paul McDonald's front porch. N.T., 6/1/1992, at 46. After noticing the dispute, he went outside and sat with his mother. Unlike his mother, Jody saw Bruce at the scene. Bruce had followed the victim, who had been chasing Rocky and screaming that he was going to kill Rocky. The victim was screaming obscenities that were directed at the neighbors and the neighborhood. Bruce was trying to keep Rocky and the victim separate, and trying to get everyone to take the argument off of his aunt's porch.

Jody then joined Bruce in trying to get everyone to depart from that particular area. According to Jody, the victim was in a rage and could not be calmed down. The victim eventually walked away, and Jody returned to his residence. He then observed the victim go to his car and retrieve an unknown item. Jody went back inside of his house, and only reemerged when he heard the shooting. He ran across the street and saw the victim lying shot on the ground. Jody did not see Holmes or Johnson at the scene of the murder at any time on the night in question.

The argument between the victim and Rocky, which resulted in Bruce telling the victim that he was disrespecting his aunt's porch, took place on Theresa Field's porch.[5] On the night in question, Fields was sitting on her porch with some family members when Rocky ran up to her house and stood in front of the hedges. The victim arrived immediately thereafter "ranting and raving," and threatening to kill Rocky. Id. at 62. The victim's sudden appearance caused Fields to fall out of her chair. Her husband, George Fields, came out of the house to see what the fuss was all about. The victim then ran down the steps and started arguing with Billy. Lamont Bruce and Jody Morris showed up and tried to restrain the victim, and attempted to get him to stop causing problems at Fields' house. George Fields stepped in and told the victim and Billy to get away from the residence, and that, if the victim did not leave, George Fields was going to hit him.

After George Fields threatened him, the victim "went crazy." Id. at 64. He started running up and down the street, insulting and threatening to kill everyone. His behavior caused Theresa Fields, like Sarah Morris, to call the police.

When the victim went to his vehicle, Fields told everyone at her house to go inside, because she believed that the victim was going to retrieve a gun. She then rushed her grandchildren into the house, while warning Billy that "he is going to kill you." Id. at 66. Shortly after she took her grandchildren into the house, Fields heard gunshots. She went back outside and saw numerous people scattering and running from the scene. She did not see Johnson on the street from the time she observed the victim go to his car or at any time after the shooting.

---

[5]  Notably, Fields stated that she was merely Bruce's friend. However, the Commonwealth produced a log from the state prison that housed Bruce prior to trial. In the log, Bruce identified Fields as his wife. The Commonwealth produced this evidence to demonstrate that the relationship was more than friendly and to illuminate Fields' potential bias for the jury. Fields repeatedly testified that George Fields, and not Bruce, was her husband.

Sheri Stewart, Fields' daughter, was upstairs in Fields' house when she heard the victim causing a disturbance in front of the home, and threatening to kill everyone in sight. She went outside, at which time she observed the victim walk to his car and retrieve a gun. The victim walked back towards the house with the gun and stood near Paul McDonald. Eventually, the victim walked back to Paul McDonald's house and stood outside. Stewart then saw two men walk from the Pep Boys parking lot and open fire on the victim. Stewart saw Bruce sitting on the steps of his house across the street from the scene of the shooting. Johnson was not one of the two men that she saw approach and shoot the victim. Stewart also stated that Holmes was not present at the time of the murder.

Wesley Bruce, Francis Bruce's brother, and also of no relation to Lamont Bruce, was standing in his doorway on Marion Street when the shooting occurred. At the time of the shooting, Wesley Bruce saw Lamont Bruce sitting on his own doorstep across the street from Paul McDonald's house. Wesley Bruce did not see Johnson or Holmes on the street at the time of the shooting.

Denise Frazier, Sheri Stewart's cousin, was upstairs in Fields' home on Marion Street after having suffered an asthma attack, whereupon she heard the victim causing a disturbance. She ran downstairs and saw the victim arguing with Rocky. She described the victim as "hyper" and outraged. Id. at 133. The victim said that he was "tired" and "ready to kill," and walked to his car. Id. at 134. Frazier watched him open his trunk and pull out a silver firearm, and then walk away to talk with Paul McDonald.

Frazier was standing on the sidewalk in front of Fields' house, and then moved to her front door, whereupon the shots that killed the victim were fired. At the time, Frazier saw Bruce standing on his front steps. She did not see Johnson or Holmes at the

scene at all. However, Frazier admitted that she was not looking at anyone's face when the shots were fired.

As is evident, the Commonwealth and the defendants presented distinctly different versions of the relevant facts. The Commonwealth portrayed the victim as upset initially, but calmer and restrained as the night went on. None of the Commonwealth witnesses testified that the victim had a gun. Many of the Commonwealth's witnesses could not identify Johnson as the shooter from photo arrays shortly after the murder, but were able to identify him positively as such at trial. On the other hand, the defense portrayed the victim as aggressive, uncontrollable, and in possession of a weapon. The defense witnesses described Lamont Bruce as a peacemaker and an observer to the murder, not a participant. Every one of the defense witnesses testified that they did not see Johnson at the scene of the murder. The jury resolved these factual disputes in favor of the Commonwealth, finding Johnson guilty of first-degree murder, conspiracy, possessing an instrument of crime, and recklessly endangering another person.[6]

Having been convicted of first-degree murder, Johnson then proceeded to the death penalty phase of his trial. At the conclusion of the death penalty hearing, the jury found two aggravating circumstances, to wit, that Johnson had knowingly created a grave risk of death to another person in addition to the victim of the offense, 42 Pa.C.S. § 9711(d)(7), and that Johnson had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9). The jury found only one mitigating circumstance, namely that Johnson was twenty-five years old at the time

---

[6] Bruce and Holmes each were convicted of third-degree murder, 18 Pa.C.S. § 2502(c), and conspiracy. Holmes also was convicted of possessing an instrument of crime. Both were acquitted of recklessly endangering another person.

of the offense, 42 Pa.C.S. § 9711(e)(4). The jury concluded that the aggravating circumstances outweighed the mitigating circumstance, and returned a death sentence. On June 10, 1992, the trial court formally sentenced Johnson to die by lethal injection. The court imposed no further penalty on Johnson's convictions for conspiracy, possessing an instrument of crime, and recklessly endangering another person. Johnson filed post-verdict motions, which the trial court denied.

Johnson, still represented by trial counsel, filed a direct appeal to this Court. In that appeal, Johnson raised, *inter alia*, challenges to the weight and sufficiency of the trial evidence, to the prosecutor's exercise of peremptory challenges on prospective black jurors, to the trial court's denial of his multiple motions for a mistrial, and to the admission of evidence pertaining to his refusal to participate in the pre-trial line-up. On November 22, 1995, this Court affirmed the judgment of sentence. See Commonwealth v. Johnson, 668 A.2d 97, 109 (Pa. 1995).[7]

On November 4, 1996, Johnson filed a *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended petition on Johnson's behalf on October 26, 1998. In the amended petition, counsel raised numerous claims, most of which alleged that trial counsel was ineffective for various reasons. In the years that followed, numerous attorneys were permitted to withdraw as counsel, and new attorneys were appointed. Johnson was represented by as many as four different attorneys during this period, until the Federal Community Defender's Office ("FCDO") undertook his representation. During this time, the various attorneys filed additional pleadings and supplements to the PCRA petition on Johnson's behalf. The FCDO continues to represent Johnson.

---

[7] Johnson filed a petition for a writ of *certiorari* with The Supreme Court of the United States. The Supreme Court denied Johnson's petition on October 7, 1996.

The PCRA court held a hearing on January 4, 2001, at which the court permitted only trial counsel to testify. Both the defense lawyer and the prosecutor acknowledged at the hearing's outset that the PCRA court explicitly limited the hearing only to trial counsel's testimony. See N.T., 1/4/2001, at 4. Nonetheless, at the hearing's conclusion, the PCRA court asked defense counsel if he intended to present any other evidence. Defense counsel informed the court that he would like to do so. The court then indicated that it would receive additional testimony on a date that the parties would select. Id. at 82-83. A subsequent hearing did occur on October 9, 2001. However, that hearing addressed only a petition to withdraw, which defense counsel had filed in the interim. The court granted the withdrawal petition. See N.T., 10/9/2001, at 3-4. Notably, the prosecutor characterized the state of the case as being "in the midst of an evidentiary hearing." Id. at 5. Notwithstanding the clear intention of the parties and the PCRA court, no other PCRA hearing occurred.

Following a lengthy delay after the hearing, the Commonwealth stipulated that trial counsel had been ineffective during the penalty phase of Johnson's trial, and consented to a new sentencing hearing. In light of the stipulation, the PCRA court vacated Johnson's judgment of sentence, and ordered a new death penalty hearing. The PCRA court subsequently denied all of Johnson's guilt-phase claims. However, rather than proceed to the penalty hearing immediately, Johnson elected to appeal his guilt-phase claims to this Court. Johnson filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On February 23, 2007, the PCRA court issued an opinion pursuant to Pa.R.A.P. 1925(a), finding that many of the claims raised by Johnson in his Rule 1925(b) statement either were waived or were previously litigated. See 42 Pa.C.S. § 9544.

Before filing a brief, Johnson filed a "Motion to Remand and to Correct the Record." Johnson noted that the PCRA court had determined that some of his claims had been waived because those claims were not raised in any of Johnson's PCRA filings. However, Johnson discovered that, at some point, the PCRA court had lost the record and had attempted to reconstruct it. The court submitted a reconstructed record to this Court that, Johnson maintained, did not contain various material time-stamped pleadings. Johnson requested that this Court remand the case back to the PCRA court for the purpose of constructing a complete record, which Johnson presumably believed would demonstrate that all of his claims had been preserved.

On June 10, 2011, this Court denied Johnson's motion. However, on November 18, 2011, after the parties submitted briefs, this Court entered a *per curiam* order vacating the PCRA court's order dismissing Johnson's PCRA petition. Noting that our review of Johnson's claims necessarily was hindered by the incomplete record, we remanded the case and directed the PCRA court to investigate and correct any discrepancies in the reconstructed record. We further directed the PCRA court to review and dispose of any issues raised by Johnson in his amended PCRA petition, and to hold "an evidentiary hearing on any claim which the court believes raises a material issue of fact and is not resolvable as a matter of law, in accordance with applicable rules and decisional law." Order, 11/18/2011, at 1.[8]

On April 10, 2014, the parties gathered in the PCRA court to correct any deficiencies in the record. On May 15, 2014, Johnson filed an amended PCRA petition

---

[8] We also directed the PCRA court to review the issue of whether the FCDO, a federal entity, should continue to represent Johnson, a state prisoner, or whether state counsel should be appointed. Order, 11/18/2011, at 3. On remand, the PCRA court noted that, at that time, the federal courts approved of FCDO's involvement in state cases. See PCRA Ct. Op., 9/26/2014, at 2 n.2.

that reflected the changes made to the reconstructed record. He listed fourteen claims for relief. On May 22, 2014, the PCRA court heard oral argument, but not testimony, on the claims raised in Johnson's May 15, 2014 amended petition. On June 10, 2014, the PCRA court issued a notice of intent to dismiss the petition without an evidentiary hearing pursuant to Pa.R.Crim.P. 909(B)(2). On June 30, 2014, Johnson filed a response to the court's Rule 909 notice. On July 10, 2014, the PCRA court entered an order dismissing the petition.

On August 6, 2014, Johnson filed a notice of appeal. The PCRA court did not direct Johnson to file another Rule 1925(b) concise statement. On September 26, 2014, the PCRA court issued an opinion pursuant to Rule 1925(a).

## II. Issues

Presently, Johnson raises the following seven issues for this Court's consideration:

1. Was trial counsel ineffective for failing to investigate, develop, and present exculpatory and impeachment evidence at trial and did the PCRA court err by failing to hold a full evidentiary hearing?

2. Was trial counsel ineffective for failing to present evidence of the actual reason [that Johnson] did not participate in a pre-trial lineup?

3. Were [Johnson's] rights violated by extensive prosecutorial misconduct, and did appellate counsel render ineffective assistance?

4. Were [Johnson's] due process rights violated by the improper admission of in-court identification testimony and was counsel ineffective?

5. Was counsel ineffective for failing to object to the trial court's inadequate and misleading cautionary charge on eyewitness identification testimony?

6. Did the PCRA court err in refusing to grant a hearing on [Johnson's] claim that the Commonwealth discriminated against African-American venirepersons in its exercise of peremptory challenges, and that trial counsel was ineffective for failing to object?

7.     Was [Johnson] denied his constitutional right to effective assistance of counsel, a fair trial, and due process because of the cumulative prejudice of the errors set forth in this brief?

Brief for Johnson at 1-2 (capitalization modified).

### III. Governing Legal Principles.

Each of Johnson's claims involves, at least in part, allegations that, at trial and on appeal, his lawyer was ineffective in some fashion. Hence, we begin by setting forth the time-honored legal precepts that govern such claims.

Our standard of review is well-settled. When reviewing the denial of a PCRA petition, we must determine whether the PCRA court's order "is supported by the record and free of legal error." Commonwealth v. Sepulveda, 55 A.3d 1108, 1117 (Pa. 2012) (citing Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007)). Generally, we are bound by a PCRA court's credibility determinations. However, with regard to a court's legal conclusions, we apply a *de novo* standard. Commonwealth v. Rios, 920 A.2d 790, 810 (Pa. 2007).

To be entitled to relief under the PCRA, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the errors enumerated in 42 Pa.C.S. § 9543(a)(2), and that his claims have not been previously litigated or waived. 42 Pa.C.S. § 9544. An issue is previously litigated if "the highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue." Id. § 9544(a)(2). An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, . . . on appeal or in a prior state postconviction proceeding." Id. § 9544(b).

To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984). See Sepulveda, 55 A.3d at 1117. This Court has recast the two-part Strickland standard into a three-part test by

dividing the performance element into two distinct components. <u>Commonwealth v. Busanet</u>, 54 A.3d 35, 45 (Pa. 2012); <u>Commonwealth v. Pierce</u>, 527 A.2d 973, 975 (Pa. 1987). Accordingly, to prove that counsel was ineffective, the petitioner must demonstrate: (1) that the underlying claim has arguable merit; (2) that no reasonable basis existed for counsel's actions or failure to act; and (3) that the petitioner suffered prejudice as a result of counsel's error. <u>Sepulveda</u>, 55 A.3d at 1117 (citing <u>Pierce</u>, 527 A.2d at 975). To prove that counsel's chosen strategy lacked a reasonable basis, a petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." <u>Commonwealth v. Cox</u>, 983 A.2d 666, 678 (Pa. 2009) (quoting <u>Commonwealth v. Williams</u>, 899 A.2d 1060, 1064 (Pa. 2006)). Regarding the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. <u>Commonwealth v. Dennis</u>, 950 A.2d 945, 954 (Pa. 2008). Counsel is presumed to be effective; accordingly, to succeed on a claim of ineffectiveness the petitioner must advance sufficient evidence to overcome this presumption. <u>Sepulveda</u>, 55 A.3d at 1117.

We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. <u>Id.</u> at 1117-18; <u>Commonwealth v. Albrecht</u>, 720 A.2d 693, 701 (Pa. 1998). Finally, counsel cannot be deemed ineffective for failing to raise a meritless claim. <u>Commonwealth v. Jones</u>, 912 A.2d 268, 278 (Pa. 2006).

The PCRA court may dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be

served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." Commonwealth v. D'Amato, 856 A.2d 806, 820 (Pa. 2004).

## IV. Analysis

We begin our discussion with Johnson's second listed issue. As noted at the outset, we grant relief in the form of an evidentiary hearing on the alibi portion of Johnson's first listed issue. We will discuss that issue last.

### A. Failure to Explain Johnson's Refusal to Participate in Pre-Trial Line-Up

In his second issue, Johnson contends that trial counsel was ineffective for failing to present evidence to explain the actual reason that Johnson declined to participate in the court-ordered pre-trial lineup. As detailed above, Paul McDonald was brought to the police station to participate in a lineup. Detective Wynn described the aborted procedure at trial, and testified that, immediately before the line-up was to commence, he was informed by Johnson's counsel that Johnson refused to participate. Detective Wynn told the jury that he was not offered a reason for this refusal.

Counsel for Johnson did not proffer an explanation to the jury for Johnson's decision. During closing arguments, the Commonwealth seized upon Johnson's decision not to participate:

> There was a court-ordered line-up in this case. [Counsel for Johnson] . . . would have you believe it wasn't fair. . . . They refused to even participate? Why? Because as soon as Paul McDonald shows up they say uh-oh, this guy is going to pick me out. He is going to pick me out. And what does this mean? That means I am gone. I did it. They are

hiding. They are hiding. Listen to the court charge. Efforts to conceal identity, to flee are all indicia of guilt, the guilty mind.

N.T., 6/2/1992, at 106-07. The trial court instructed the jury generally on the concept of consciousness of guilt. N.T., 6/3/1992, at 12-13.

During the PCRA proceedings, Johnson's counsel stated that, on the day of the scheduled line-up, Johnson was wearing a short sleeved shirt, which revealed a tattoo on Johnson's arm that read "WILL." Counsel maintained that, with no long sleeved shirt to cover it, the tattoo would have identified Johnson to Paul McDonald as a participant in the murder by name instead of by sight. Simply put, Johnson believed that the tattoo would have rendered the line-up overly, and prejudicially, suggestive.

Trial counsel did not present any evidence in this regard at trial, and later testified that he did not have a particular reason to omit this evidence as part of his strategy. Johnson now argues that effective counsel would have presented evidence to the jury of Johnson's actual reason for not participating in the line-up. At a minimum, Johnson maintains that effective counsel would have filed a pretrial motion *in limine* seeking to preclude Detective Wynn's testimony at trial. Johnson argues that counsel lacked a reasonable basis for failing to do so. Finally, Johnson contends that he suffered prejudice by counsel's omission of such evidence. He asserts that, without evidence in response to Detective Wynn's testimony, the jury necessarily construed his refusal to participate in the line-up as an admission of guilt. Johnson points out that there was no physical evidence linking him to the murder, and that he had not confessed to the crime. As such, he argues, had counsel successfully rebutted Detective Wynn's testimony, the outcome of the trial would have been different.

The Commonwealth responds that Johnson has not identified the evidence that his counsel should have produced for the jury. The Commonwealth then argues that Johnson has not demonstrated that he was prejudiced by counsel's inaction. The

Commonwealth notes that Johnson's tattoo was too small and indistinct to have had an actual impact upon any identification. Moreover, the Commonwealth asserts that Detective Wynn's testimony was relevant only to consciousness of guilt, which "was of merely peripheral significance given the extensive *direct* evidence of guilt from the eyewitnesses." Brief for the Commonwealth at 30 (emphasis in original).

Johnson's claim fails. He has not demonstrated that it has arguable merit. We first note that there is no constitutional right to refuse to participate in a line-up. See United States v. Wade, 388 U.S. 218, 221-23 (1967). Moreover, as the Commonwealth astutely observes, Johnson has not explained the type of evidence that he would have had counsel proffer to the jury. Presumably, the only two people that could have communicated that information to the jury were Johnson and his trial attorney. Johnson knowingly waived his right to testify at trial, and counsel could not testify as a witness in the trial. See Pa.R.P.C. 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness. . . ."). In other words, counsel had no competent evidence at his disposal that he could have presented to the jury concerning the tattoo.

Johnson's claim also fails because Johnson cannot demonstrate that, had counsel presented the tattoo evidence (if such competent evidence existed), the outcome of the trial would have been different. Paul McDonald, who was the person that was to view the lineup, identified Johnson at trial as the murderer. The jury was required to assess the credibility of that identification based upon, *inter alia*, Paul McDonald's demeanor and opportunity to observe Johnson in the seconds during which the assailant appeared and shot the victim. We fail to comprehend how knowing that Johnson elected not to participate in the line-up because of a tattoo on his arm would have impacted the jury's assessment of Paul McDonald's in-court identification in any

way. Johnson has not demonstrated prejudice, nor has he shown that he is entitled to an evidentiary hearing on this issue.

## B. Failure to Appeal Alleged Instances of Prosecutorial Misconduct

In his next argument, Johnson alleges numerous instances of prosecutorial misconduct during closing arguments, and asserts that counsel was ineffective for failing to pursue relief for such misconduct on direct appeal. In his closing argument, the prosecutor suggested that the jury consider the eyewitness testimony first "before [they] acquit, and . . . send these people back on the street." N.T., 6/2/1992, at 113. Johnson maintains that this comment "undermined the presumption of innocence and focused the jury's attention on [Johnson's] likely future dangerousness instead of whether [he] committed the charged offense." Brief for Johnson at 36. Johnson also asserts that the prosecutor committed misconduct by implying that defense counsel was attempting to manipulate the jury and play to its emotions by stating that the victim was "gunned down like a dog on the street." Id. at 38 (quoting N.T., 6/2/1992, at 108). Furthermore, Johnson takes issue with the prosecutor's suggestion that, because the defense witnesses "lied for Robert Holmes and William Johnson," they lied for Lamont Bruce as well. Id. at 40 (quoting N.T., 6/2/1992, at 108). Johnson insists that the prosecutor injected victim impact evidence into the guilt-phase of the trial when he stated that "a man [that the victim's family] knew and loved was slaughtered that night." Id. at 41 (quoting N.T., 6/2/1992, at 95-96). Finally, Johnson outlines various other instances in which he believes that the prosecutor mischaracterized defense counsel's arguments and implied that those arguments were proffered for the sole purpose of misleading the jury. Id. at 36-38 (quoting N.T., 6/2/1992, at 105-07). Johnson

concludes that the prosecutor's comments, individually and collectively, constituted misconduct that, if challenged on direct appeal, would have resulted in a new trial.

Johnson points out that, although counsel objected to these statements, he did not pursue relief from the statements on direct appeal. Johnson asserts that counsel could not have had a reasonable basis for failing to do so. Brief for Johnson at 42.

Johnson maintains that he was prejudiced by counsel's decision not to pursue the issues on direct appeal. Johnson argues that, because the prosecutor's comments unconstitutionally "tainted the fairness of the jury deliberations and consideration of whether the Commonwealth met its burden," see id. at 43, this Court would have awarded him a new trial on direct appeal had the issue been presented.

In response, the Commonwealth focuses first upon the reasonable basis prong. The Commonwealth points out that Johnson did not query counsel at the first PCRA hearing about counsel's decision to forego these arguments on direct appeal. Consequently, the Commonwealth explains, Johnson cannot satisfy that prong of the ineffectiveness test. The Commonwealth then proceeds to examine each instance of misconduct alleged by Johnson, and argues that none of the comments would have warranted any form of relief on appeal.

"Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." Commonwealth v. Jones, 683 A.2d 1181, 1199 (Pa. 1996) (citation omitted). A prosecutor enjoys reasonable latitude during closing arguments, and may advocate with force, vigor, and oratorical flair. Commonwealth v. Brown, 711 A.2d 444, 454 (Pa. 1998) (citation omitted). Nonetheless, this latitude is not unrestrained. Argument must

be based upon matters in evidence, or upon the legitimate inferences that can be drawn from that evidence.  Commonwealth v. Chester, 587 A.2d 1367, 1377 (Pa. 1991).  We must consider the challenged statements within the context in which they were offered.  We will not view those statements in a vacuum.  Commonwealth v. Weiss, 776 A.2d 958, 968 (Pa. 2001).

Although Johnson pays lip service to these long-standing principles, he does not measure each challenged statement against them.  Instead, Johnson elects to assail the Commonwealth's closing with broad allegations of impropriety and unconstitutionality.  Even so, the arguable merit prong is not where Johnson's argument most obviously fails.  Even if we assume, *arguendo*, that Johnson has demonstrated that each of his challenges to the prosecutor's statements has arguable merit, Johnson fails entirely to satisfy the reasonable basis prong.

As noted above, at a minimum, to establish the reasonable basis prong, a PCRA petitioner must prove that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Cox, 983 A.2d at 678.  Johnson makes no attempt to satisfy this standard, failing entirely in his present brief to proffer any compelling advocacy on this point.  Instead, Johnson baldly asserts that counsel "could have had no reasonable strategic basis for failing to raise each instance."  Brief for Johnson at 42.  In effect, Johnson is claiming that counsel could have had no reasonable basis for declining to pursue these issues.  We cannot accept such an argument.  It is within an attorney's purview to decide which issues to pursue on appeal.  See Commonwealth v. Jette, 23 A.3d 1032, 1043 (Pa. 2011).[9]  Counsel may have

---

[9]    In Jette, we noted the following:

It is well settled that appellate counsel is entitled, as a matter of strategy, to forego even meritorious issues in favor of issues he believes pose a greater likelihood of success.  See Commonwealth v. Robinson, 864 A.2d

(continued…)

reviewed the governing case law and determined that these issues were unlikely to garner any form of relief. Counsel may have elected to advance only the arguments that he believed would give Johnson the best chance of success. Counsel may have determined that the challenged statements would not have fallen within that category. It is Johnson's burden to elicit counsel's reasons, and to demonstrate that the chosen course of action by counsel was objectively unreasonable in light of the alternatives. Johnson's bald claim that there could not have been a reasonable basis falls short of satisfying this burden. Johnson has not established that he is entitled to a hearing on this claim.

## C. Failure to Seek Suppression of Identification Testimony

Next, Johnson argues that counsel was ineffective for not seeking to suppress identification testimony from certain witnesses. Johnson notes that counsel did file a motion to suppress identification testimony from witnesses who had identified Johnson from the photo array, asserting that the photo arrays were unduly suggestive. The trial

---

(…continued)
> 460, 479 n.28 (Pa. 2004), *cert denied*, 546 U.S. 983, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005) ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (quoting Smith v. Murray, 477 U.S. 527, 536, (1986)); Jones v. Barnes, 463 U.S. 745, 751-52, (1983) (observing that "experienced advocates since time beyond memory emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues").

Jette, 23 A.3d at 1043 (citations modified)

court denied the motion.[10] However, Johnson maintains that counsel did not seek, and should have sought, to have the trial court suppress any identification testimony from witnesses who had not positively identified Johnson from the photo array but who later identified him "in the suggestive circumstances inherent at a preliminary hearing." Brief for Johnson at 45. Johnson contends that those latter identifications were "rife with suggestiveness," and were the result of repeated witness exposure to Johnson's identity in the photo arrays, at the preliminary hearing, or both, all while knowing that Johnson had been charged with murder. Id.

Johnson first challenges Sonya Carr's identification. Johnson points out that Carr did not identify him from the photo array that was presented to her hours after the murder. Two days later, Carr again was unable to identify Johnson as the shooter from a second photo array. Johnson observes that Carr only was able to identify him at trial, nearly one year later, knowing that he had been charged with her fiancée's murder. Given the totality of the circumstances surrounding Carr's testimony, Johnson contends that the "identification procedure was impermissibly suggestive so as to give rise to a substantial risk of misidentification." Id. at 53 (citation omitted).

Johnson next challenges Ardell McDaniel's identification. McDaniel also was unable to identify Johnson positively from a photo array immediately after the murder. Two days later, McDaniel was provided a second photo array, from which he selected Johnson. However, he did not identify Johnson conclusively. Rather, McDaniel stated that Johnson and another male from the photos "looked like they could have been there." N.T., 5/26/1992, at 24. When pressed, McDaniel further stated that Johnson's photo "looks more familiar." Id. At Johnson's preliminary hearing three months later,

---

[10] On direct appeal, this Court affirmed the trial court's denial. See Johnson, 668 A.2d at 103.

McDaniel positively identified Johnson as the shooter. Johnson maintains that the "procedures leading to [] McDaniel's identification of [him] as the shooter were unconstitutionally suggestive," as the "setting of a preliminary hearing removed any and all initial doubt from McDaniel's identification." Brief for Johnson at 56.

Johnson also argues that Francis Bruce's identification of him was unduly suggestive because the police only showed her one photograph, and that picture depicted Johnson. Francis Bruce identified Johnson at trial one year later as the shooter as well. Johnson asserts that, because Francis' pre-trial identification was based upon only a single photograph, the process was tainted from the beginning, and rendered her trial identification "highly unreliable." Id. at 61 (citing Commonwealth v. Buehl, 508 A.2d 1167, 1178 (Pa. 1986) (stating that the use of a single photograph of a suspect when obtaining an identification may be impermissibly suggestive)). Johnson further claims that there was no independent basis for Francis' identification because she did not have a meaningful opportunity to view the shooter on the night in question, because she indicated that she saw very little of the shooter, and because she gave no initial description of the shooter to the police before being shown the lone photograph. Finally, Johnson assails the credibility of Francis' identification due to Francis' use of crack cocaine on the day of the murder.

Johnson alleges that trial counsel was ineffective for not challenging the above-described identifications in any manner. He submits that the claim has arguable merit because the identifications were overly suggestive and argues that counsel had no reasonable basis for failing to object to this testimony. Johnson believes that a challenge to the admissibility of these identifications would have been consistent with, and necessary to, his misidentification defense. Had counsel sought to preclude the identification testimony either before or during trial, or via a motion for a mistrial,

Johnson argues, there is a reasonable possibility that the outcome of the case would have been different.

The Commonwealth responds that the witnesses in question were not subject to unduly suggestive identification procedures and that the witnesses' in-court identifications were correctly admitted as evidence. The Commonwealth further argues that each witness had an independent basis for his or her in-court identification. Thus, even if the witnesses had been subjected to suggestive pre-trial procedures, Johnson cannot demonstrate that he was prejudiced by his counsel's failure to object.

A court must assess the reliability of an out-of-court identification by examining the totality of the circumstances. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). A pre-trial identification violates due process only when the facts and circumstances demonstrate that the identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification. Commonwealth v. Hughes, 555 A.2d 1264, 1272-73 (Pa. 1989). The PCRA court determined that the pre-trial identification procedures in this case did not create such a danger. We agree.

The court noted that, although both Carr and McDaniel failed to identify Johnson from an initial photo array, both identified him from a subsequent array. PCRA Ct. Op., 9/26/2014, at 12. Furthermore, the photographs utilized during the arrays were selected randomly by the police, and depicted individuals that were similar in age, had similar facial hair, and bore "strikingly similar outlines of their face." N.T., 5/26/1992, at 51. These were the photos that were shown to Carr. Johnson has not demonstrated that the photographs were unduly suggestive, or that anything about the procedure unconstitutionally tainted Carr's in-court identification. See Commonwealth v. Floyd, 431 A.2d 984, 987 (Pa. 1981) (stating that, where an initial one-on-one confrontation

between the accused and the identifying witness occurs in court, identification evidence derived therefrom is not automatically unreliable).  Johnson's claim as it pertains to Carr lacks arguable merit.

The police also showed similarly selected photographs to Ardell McDaniel, who tentatively selected Johnson from that array, although the identification was not definite. The mere fact that, at best, McDaniel was unsure about the identification does not mean that later identifications, *ipso facto*, were unreliable.  Initial equivocation does not render later identifications constitutionally unreliable *per se*.  Johnson has not demonstrated anything in the pre-trial proceedings with regard to Ardell McDaniel that would give rise to a very substantial likelihood of irreparable misidentification, see Hughes, *supra*. Accordingly, Johnson has not proven that this particular claim has arguable merit.

We turn, finally, to Francis Bruce's in-court identification of Johnson.  Unlike the others, Francis Bruce was shown only a single photograph of Johnson during the police identification procedure.  The PCRA court noted that Ms. Bruce had known Johnson for years.  This, the court believed, overcame any suggestiveness in the procedures involving her.  See Commonwealth v. Abdul-Salaam, 678 A.2d 342, 349 (Pa. 1996) (holding that, if a pre-trial identification is tainted, "the subsequent in-court identification will be admissible if there exists an independent basis for the identification").  To determine whether a sufficiently independent basis for the identification exists, a court must consider: (1) the opportunity of the witness to view the suspect at the time of the offense; (2) the witness' focus or attention upon the suspect; (3) the accuracy of the witness' description of the suspect; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  Commonwealth v. Carter, 643 A.2d 61, 71 (Pa. 1994).

Despite the apparent pre-trial suggestiveness of the single photograph procedure, Ms. Bruce had an independent basis for the in-court identifications. She testified that she was able to observe Johnson at all of the critical points on the night in question, albeit for brief periods of time. More importantly, as the PCRA court explained, Ms. Bruce had known Johnson for a number of years prior to the incident, a fact that we have held is sufficient to serve as an independent basis for an otherwise illegally tainted identification procedure. See Commonwealth v. Small, 741 A.2d 666, 679 (Pa. 1999) ("Since the witnesses were acquainted with [the suspect] prior to the commission of the crime, there is an independent corroboration that the in-court identification was not tainted.") Once more, Johnson has not demonstrated that this claim has arguable merit.

Because Johnson has not proven arguable merit with regard to the identifications of each of the witnesses that he claims were tainted, we need not consider the remaining prongs of the ineffectiveness test. This claim fails. No evidentiary hearing was warranted on this claim.

### D. Failure to Object to Kloiber Instruction

In his next argument, Johnson argues that trial counsel was constitutionally ineffective for failing to object to the trial court's instruction to the jury regarding the reliability of eyewitness testimony, commonly known as a Kloiber charge.[11] At trial, recognizing the difficulties that some witnesses had in identifying Johnson shortly after the murder as well as other credibility problems with some of the witnesses, the trial court provided the jury with the following instruction:

---

[11] See Commonwealth v. Kloiber, 106 A.2d 820 (Pa. 1954), discussed in more detail *infra*.

You have heard testimony about who was where and when called identity testimony, who was there, who was not there. I am not going to outline that for you. It's your recollection of who was there and who was not there that controls. If you heard a witness [testify] and if that witness was positive of the identification, if you believe that the identification was not weakened by any prior failure to identify[,] but remained even after cross[-]examination, [*sic*] need not be received with caution.

Indeed, positive testimony as to identity may be treated as a statement of fact. On the other hand, where a witness is not in a position to clearly observe or is not positive as to identity, or the positive statement in [c]ourt as to identity are [*sic*] weakened by a qualification or by failure to identify a person on one or more prior occasions such as in a photo array or such as seeing screens or any other prior identification, if you believe that the . . . positive statements in [c]ourt were weakened because[,] on a prior occasion[,] that the person did not identify the same individual, then you have to decide on the accuracy of the identification as to whether or not the identification becomes so doubtful that the testimony as to identity must be received with caution.

The rule is that a positive, unqualified identification of a defendant by one witness is sufficient for a conviction. But[,] if you believe that there was a prior failure to identify on one or more prior occasions, then the accuracy of the identification is so doubtful that the testimony as to identity must be received with caution.

N.T., 6/3/1992, at 14-15.

Johnson steadfastly maintains that trial counsel should have objected to this instruction, and should have offered an alternative instruction for the court's consideration. Johnson further argues that the Kloiber instruction was inadequate and misleading because the instruction "did not require jurors to receive that testimony with caution and, instead, encouraged them to accept the identifications as proven facts simply because the witness claimed to be certain." Brief for Johnson at 67. Johnson asserts that the instruction did not comply with Kloiber's mandate because the court instructed the jurors that they did not need to receive a witness' identification testimony with caution if the identification "remained even after cross[-]examination positive and unqualified[.]" Id. at 68 (quoting N.T., 6/3/1992, at 15). Johnson submits that the central premise of Kloiber is that "where the predicate circumstances are met, the jurors

are to be instructed that they must receive the testimony with caution, regardless of the witness' certainty after cross[-]examination." Id. at 69.

Johnson claims that the trial court erred in telling the jurors that, if they believed that the identification testimony was weakened "because[,] on a prior occasion . . . the person did not identify the same individual, then you have to decide on the accuracy of the identification as to whether or not the identification becomes so doubtful that the testimony as to identity must be received with caution." Id. at 70 (quoting N.T., 6/3/1992, at 15). Johnson suggests that this articulation of the rule negates the very purpose of Kloiber because, "[i]f the jury already doubts the reliability of the testimony, a charge requiring caution is unnecessary and redundant." Id. Finally, Johnson contends that the instruction emphasized that an identification need not be received with caution if the witness is positive in the identification, and that a single positive identification is sufficient for a conviction. Such an instruction, Johnson concludes, merely emphasizes that the jury may accept identifications as facts if it has no particular reason to doubt them.

The Commonwealth submits that the instruction did not circumvent Kloiber, and, that, even if it did, Johnson has not demonstrated that he was prejudiced in any way. The Commonwealth contends that Johnson considers the trial court's instruction out of context, and reads the challenged portions in isolation. When read as a whole, the instruction, according to the Commonwealth, is an adequate and accurate statement of the law. Even if the instruction veered from Kloiber in a substantive way, the Commonwealth maintains that Johnson suffered no prejudice, because the instruction was "relevant only to the testimony of [] Carr--the one person among the five eyewitnesses who did not see the murder." Brief for the Commonwealth at 54 (emphasis in original). The Commonwealth notes that four other eyewitnesses

positively identified Johnson as the shooter, eliminating any purported prejudice from the allegedly defective instruction.

In Kloiber, this Court held as follows:

[W]here the witness is not in a position to clearly observe the assailant or he is not positive as to identity, or his positive statements as to identity are weakened by qualification, or by the failure to identify the defendant on one or more prior occasions, the accuracy of the identifications is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

Kloiber, 106 A.2d at 826-27. A defendant is entitled to a Kloiber instruction where a witness: (1) was not in a position to clearly observe the defendant, or is not positive as to identity; (2) equivocated on the identification; or (3) failed to identify the defendant on prior occasions. Commonwealth v. Ali, 10 A.3d 282, 303 (Pa. 2010) (citation omitted). In Kloiber, we also explained that, "[w]here the opportunity for positive identification is good and the witness' identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution." Kloiber, 106 A.2d at 826 (emphasis added).

There is no question in this case that Johnson was entitled to a Kloiber instruction, and that the trial court provided the instruction. The instruction, as given, was not a model of clarity. However, we observe no substantial defect in that instruction such that counsel was required to object in order to be constitutionally effective. To the contrary, the trial court's instruction, in considerable part, tracked this Court's language in Kloiber, as cited immediately above, and imparted to the jurors the necessary and relevant information. Reviewed in its entirety, the instruction informed the jurors that it was their duty to decide whether the identification testimony was "so doubtful that the testimony as to identity must be received with caution." N.T., 6/3/1992, at 15. Contrary to Johnson's arguments, the jury was not afforded the discretion to

decide whether to receive the testimony with caution. Rather, the jury was given the discretion only to decide whether the testimony was unreliable, and, if so, the jury then was instructed that it must receive the testimony with caution. Additionally, it is well-established in Pennsylvania that the jury may treat a positive identification as a statement of fact. See Kloiber, 106 A.2d at 826; Commonwealth v. Trivigno, 750 A.2d 243, 253 (Pa. 2000); Commonwealth v. Henderson, 438 A.2d 951, 958 (Pa. 1981). Although, the court's instruction lacked precision, we detect nothing about that instruction that was inaccurate or that was an attempt to circumvent Kloiber. See Commonwealth v. Uderra, 862 A.2d 74, 92 (Pa. 2004) ("[A]n imperfect instruction does not constitute reversible error where the charge, taken as a whole, fairly and accurately conveys the essential meaning."). Johnson has not demonstrated that this claim has arguable merit. No evidentiary hearing was warranted on this claim.

### E. Batson Claim of Racial Discrimination During Jury Selection; Failure to Object

In his next argument, Johnson alleges that the PCRA court erred by refusing to grant a hearing on his claim that the Commonwealth impermissibly excluded African-American venirepersons, in violation of the United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79 (1986). In light of this perceived error, Johnson argues that trial counsel was ineffective for neglecting to object to the process, which, in effect, resulted in failure to preserve a Batson challenge. In support of his argument, Johnson notes that the Commonwealth utilized seven of its fourteen peremptory challenges to strike African-American potential jurors, compared to only seven of twenty-five non-African-Americans. Johnson further alleges that this created a "suspicion of discrimination" that is sufficient to establish a *prima facie* Batson violation. Brief for Johnson at 77 (quoting Johnson v. California, 545 U.S. 162, 170 (2005) (explaining that a "defendant satisfies the requirements of Batson's first step by producing evidence

sufficient to permit the trial judge to draw an inference that discrimination has occurred")).

The Commonwealth responds that Johnson did not "come close to carrying his burden to proffer evidence of actual, purposeful discrimination." Brief for the Commonwealth at 58. The Commonwealth points out that Johnson presented no evidence of the racial composition of the full venire. Moreover, the Commonwealth asserts, the numerical evidence offered by Johnson was "far less compelling than proffers that have been deemed inadequate to establish . . . a *prima facie* case of discrimination." Id. at 58-59 (citations omitted). Finally, the Commonwealth notes that the trial court, addressing the prosecutor's strikes *sua sponte* during trial, credited the prosecutor's race-neutral reasons for the peremptory challenges to the stricken African-American venirepersons,[12] and concludes that there is "no basis that would warrant a disturbance of the trial court's ruling." Id. at 61.

We agree with the Commonwealth. Johnson's Batson claim is meritless, as is the derivative ineffective assistance of counsel claim alleging failure to preserve a Batson issue. In Batson, the United States Supreme Court established a three-part inquiry to evaluate claims that a prosecutor engaged in racial discrimination during jury selection. First, a defendant must make a *prima facie* demonstration that the prosecutor exercised peremptory challenges upon the basis of race. Second, the burden then

---

[12] The Commonwealth offered the following reasons for striking the African-American venirepersons from the panel: the first juror was thought to be irresponsible because she had been unemployed for ten years and had five children under the age of fifteen; the second juror had been dismissed from a job for willful misconduct; the third juror equivocated on the death penalty to the extent of shouting at the prosecutor; the fourth juror was nineteen years old, and the prosecutor stated that he would never select a juror under the age of twenty-one for a capital case; the fifth juror's father was serving a prison term for murder; and the sixth and seventh jurors equivocated on the death penalty. N.T., 5/27/1992, at 118-22.

shifts to the prosecutor to articulate a race-neutral explanation for striking the particular juror. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, 476 U.S. at 96-98. When the defendant does not object during the *voire dire* process, "it is exponentially more difficult to perform a reasoned assessment concerning the presence or absence of purposeful discrimination." Uderra, 862 A.2d at 86. Where no objection is lodged, "it appears to be an emerging view that a defendant is not entitled to the benefit of Batson's burden-shifting formula, but instead, bears the burden in the first instance and throughout of establishing actual, purposeful discrimination." Id.[13]

Johnson's sole argument in support of his Batson claim is that the prosecutor rejected a higher percentage of African-American potential jurors than non-African-American potential jurors. This claim is not sufficient to establish a *prima facie* Batson violation, nor is it sufficient to establish actual, purposeful discrimination. See Commonwealth v. Roney, 79 A.3d 595, 620-21 (Pa. 2013) (holding that the prosecutor's use of peremptory challenges to strike thirteen out of nineteen African-American venirepersons, but only four out of twenty-four non-African-American venirepersons, was inadequate to establish *prima facie* case of discrimination); Commonwealth v. Ligons, 971 A.2d 1125, 1144 (Pa. 2009) (holding that striking more African-Americans

---

[13] In Uderra, we stated:

> Batson's burden-shifting formula makes sense when applied to an objection raised sufficiently promptly that the attorney exercising the challenges can reasonably be expected to remember the reasons for the challenges. On the other hand, it would be altogether unreasonable to shift the burden of explanation if the objection is so tardily made that the challenging attorney cannot be reasonably expected to remember.

Uderra, 862 A.2d at 86 (citing McCrory v. Henderson, 82 F.3d 1243, 1251 (2d Cir. 1996)).

than Caucasians, in and of itself, does not equate to purposeful discrimination). Moreover, the jury that actually was empaneled included seven African-Americans and one Hispanic-American, despite the fact that the prosecutor had six peremptory challenges that went unused. N.T., 5/27/1992, Vol. II, at 118. Johnson's Batson claim is unfounded, and his ineffective assistance of counsel claim lacks arguable merit. No evidentiary hearing was warranted on this claim.

**F. Failure to Investigate, Discover, and Present Fact and Alibi Witnesses at Trial**

We return now to Johnson's first stated issue: whether trial counsel was ineffective for failing to investigate and present at trial exculpatory and impeachment evidence. Specifically, Johnson charges counsel with failing to present a multitude of witnesses whose testimony, Johnson claims, if presented to the jury, would have commanded an acquittal. Johnson identifies the following fact witnesses that he contends counsel should have discovered either by reviewing the police reports or through independent investigation:

- Kelly J. Morris, who allegedly observed four or five people involved in the shooting, and saw the victim remove a lug wrench from the trunk of his car.

- William I. Maynor, who told police that he saw the victim taking a weapon from the trunk, and who claimed he did not see Johnson at the scene of the murder.

- Dana Taylor, who asserted that Johnson was not one of the four people that she saw at the scene on the night in question.

- Eric Savage, who allegedly saw the victim push Lamont Bruce, and claimed that Robert Holmes was not at the scene.

- Elisha Savage, who observed the victim go to his car and retrieve a weapon.

- Tracey Green, who was in a relationship with a man named Franklin Snead, who used the white Chevy Blazer in suspicious circumstances and admitted to Green that he got into trouble with the police on the night of the murder.

Johnson also identifies the following two alibi witnesses that he asserts counsel failed to discover and present at trial:

- Latonya Handy, who stated that she was with Johnson for all but fifteen minutes on the day of the murder, asserted that Johnson walked in the opposite direction from where the murder occurred when he left for that period of time, and claimed that Johnson did not have a gun in his possession on that day. Handy also asserted that Johnson did not have a relationship with Lamont Bruce, and that he did not hang out on Marion Street.

- Paige White, who corroborated Handy's statement, stating that she was with Johnson and Handy throughout the day and left with Johnson for a short period of time to shoot dice. White also confirmed that Johnson did not have a relationship with Lamont Bruce.

Brief for Johnson at 16-17.[14]

"To be entitled to relief on a claim of ineffectiveness for failure to call a witness, [an] appellant must demonstrate [that]: the witness existed, was available, and willing to cooperate; counsel knew or should have known of the witness; and the absence of the witness's testimony prejudiced [the] appellant." Commonwealth v. Birdsong, 24 A.3d 319, 334 (Pa. 2011) (citing Commonwealth v. Fletcher, 750 A.2d 261, 275 (Pa. 2000)).

---

[14] Johnson also alleges in his brief that trial counsel was ineffective for failing to cross-examine certain witnesses about their respective criminal histories. Brief for Johnson at 17-18. However, Johnson does not develop these claims substantively as to each prong of the ineffective assistance of counsel test, and focuses instead upon the failure to call the above-listed witnesses at trial. Consequently, Johnson has not demonstrated that he is entitled to relief on these claims.

A PCRA petitioner cannot succeed on such a claim if the proposed witness' testimony "would not have materially aided him. In such a case, the underlying-merit and prejudice prongs of the [ineffective assistance of counsel] test logically overlap." Commonwealth v. Baumhammers, 92 A.3d 708, 725 (Pa. 2014). "To show prejudice, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's allegedly unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citing Commonwealth v. Gibson, 951 A.2d 1110, 1120 (Pa. 2008)).

We begin our discussion with the fact witnesses listed above. Most, if not all, of the information that these individuals would have presented to the jury if called as witnesses was cumulative of the testimony already in the record. Hence, no prejudice to Johnson arose by virtue of their absence. Kelly Morris, William Maynor, and Elisha Savage all told the police that they observed the victim go to his vehicle and retrieve a weapon. The record is rife with testimony, from Commonwealth and defense witnesses alike, that the victim went to the trunk of his car at some point during the encounter and retrieved some type of a weapon, although the witnesses did not agree on the type of weapon that the victim procured. For instance, Commonwealth witnesses Carr and Francis Bruce both testified that the victim went to his car and removed a wooden object from the trunk. Sarah Morris and Jody Morris, both defense witnesses, testified that the victim went to his car and obtained a weapon, though neither could identify that weapon. Defense witness Sherri Stewart watched the victim go to his car and return with what she believed was a gun. The record is replete with evidence proving that the victim went to his car and retrieved an item, presumably to use as a weapon or in

defense of himself. In this particular instance, failure to introduce more of the same does not equate to prejudice.

Similarly, William Maynor and Dana Taylor told the police that Johnson was not present at the scene of the murder. All of the defense witnesses testified to the same, including Sarah Morris, Jody Morris, Theresa Fields, Sherri Stewart, Wesley Bruce, and Denise Frazier. The information that Maynor and Taylor would have presented is simply cumulative. Here again, no prejudice resulted from the witnesses' absence at trial.

Kelly Morris and Dana Taylor told the police that they observed at least four or five people participating in the murder. This contrasted with the Commonwealth's witnesses, who testified that only three people approached the victim right before the shooting. Even if Morris' and Taylor's reports were accepted as true, we fail to comprehend how this information would either have exonerated Johnson or undermined confidence in the verdict. The fact that there may have been more people than the Commonwealth's witnesses observed in no way means that Johnson was not one of those people. Moreover, the central issue at Johnson's trial was identification. The case essentially boiled down to the jury having to decide whether to believe the witnesses who claimed to have seen Johnson shoot the victim or those who claimed that he was not there at all. Testimony regarding the number of people that approached the victim right before the murder would have been insignificant, if relevant at all, to the jury's deliberations. Consequently, even if Johnson could satisfy all of the other elements of the failure to call a witness test, he cannot demonstrate that the outcome of the trial would have been different had these witnesses been presented to the jury.

The same can be said about the proffered testimony of Eric Savage and Tracey Green. Savage would have testified that the victim acted as the aggressor toward

Lamont Bruce, and that co-defendant Robert Holmes was not at the scene at all. Tracey Green would have testified that her boyfriend, Franklin Snead, used the Blazer on the night in question and admitted to getting in trouble with the police for doing so. None of this information would exonerate Johnson or otherwise benefit him in a manner that would undermine the verdict. That the victim pushed Lamont Bruce is immaterial to Johnson's misidentification defense; Johnson did not present a self-defense or defense of others defense. Were Robert Holmes absent from the scene, this also would have little bearing upon the issue of whether Johnson was the person who pulled the trigger. This testimony would not have undermined the credibility of all of the witnesses who identified Johnson to the degree that the verdict would have been different. Finally, any testimony regarding Snead and the Blazer would not have impacted the jury's decision to credit the Commonwealth's witnesses instead of the defense witnesses. Simply put, none of these proposed witnesses, had they testified in the manner that Johnson suggests, would have altered the outcome of the trial or undermined the verdict in any way.

The same cannot be said conclusively about Johnson's alibi witnesses. As noted, Johnson alleges that trial counsel was ineffective for failing to investigate and produce Latonya Handy and Paige White as alibi witnesses. Handy would have testified that, on the day in question, Johnson was with her for all but fifteen minutes. She also would have testified that Johnson did not have a gun on that date, and that, when he returned after the fifteen minute interval, he acted normally, not out of breath, nervous, or in any manner consistent with someone who had just killed another person. Handy would have told the jury that Johnson does not hang out on Marion Street, and that, when he left her presence, he walked in the opposite direction of Marion Street. White would have corroborated Handy's alibi testimony, offering that she was with

Handy and Johnson for most of the day. White also would have testified that she was with Johnson for the fifteen minutes that he left Handy's presence, as she went with Johnson up the street to throw dice.

As noted earlier, Johnson presented a misidentification defense, seeking to convince the jury that he was not at the scene of the crime. Although multiple witnesses testified that Johnson was not at the scene of the murder, no witness accounted for Johnson's whereabouts during the relevant time periods. Handy and White could have done so.

Generally, "in order to constitute an alibi, evidence must preclude the possibility of a defendant's presence at the scene of the crime. . . . [I]ts relevance depends on precluding the possibility that the defendant committed the offense; otherwise it is not an alibi." Commonwealth v. Jones, 602 A.2d 820, 822 (Pa. 1992). The PCRA court concluded that neither Handy's nor White's testimony amounted to an alibi because "neither precludes the possibility that [Johnson] shot the decedent." PCRA Ct. Op. at 8. For purposes of deciding whether there is a genuine issue of material fact warranting an evidentiary hearing, proposed alibi testimony is not so narrowly construed. A gap in the time that Handy was with Johnson does not, *ipso facto*, disqualify the alibi proffer. To so hold, without at least receiving testimony, would mean that no proffered alibi could be successful unless the proposed testimony would account for the defendant's movements during every second of the day in question.

In this case, the fifteen-minute gap allows the possibility that Johnson committed the offense, but does not entirely negate the proffered alibi from Handy. White accounted for the fifteen minutes that Johnson was not in Handy's presence. The PCRA court nonetheless concluded that a gap in time existed within which Johnson could have committed the murder. White's proffer created a genuine issue of material

fact as to this point, justifying an evidentiary hearing to enable the PCRA court to assess the credibility of both White and Handy.

At the time that the PCRA court rejected the alibi claim, the court did not know when the gap in time occurred as it related to the time that the murder was committed. In other words, the gap in time could have occurred hours prior to the murder. The court also based its decision upon the assumption (reached without knowing the distance between Handy's residence and the murder scene) that Johnson could have left Handy's residence, traveled an unknown distance, participated in the murder and the subsequent vehicle chase, and then returned to Handy's residence, all in under fifteen minutes. This sequence of events may well be possible in that time frame, or it may well be that Handy and White are lying. We do not know. Neither did the PCRA court. These alibi witnesses raised genuine issues of material fact, which should have prompted the PCRA court to hold an evidentiary hearing. See D'Amato, *supra*; Pa.R.Crim.P. 909(B)(2).

It is clear from their declarations that Handy and White were available and willing to testify for Johnson had they been called as trial witnesses by defense counsel. The question then turns to whether Johnson can demonstrate that he was prejudiced by these witnesses' absences at trial. This is an issue that the PCRA court, in the first instance, must confront after it holds an evidentiary hearing. We observe that the trial evidence is not so overwhelming that a hearing would be futile on its face. Although many of the witnesses that testified against Johnson identified him as the shooter, much of that eyewitness testimony was riddled with credibility problems. For instance, Carr could not select Johnson from photo arrays administered shortly after the murder, but was able to identify him over one year later. She also testified that she did not see the shooting itself. Francis Bruce, a crack cocaine addict who had consumed the narcotic

on the day in question, observed the shooter for only a few seconds. She initially identified someone other than Johnson as the shooter. Nancy Jennings initially told the police that Lamont Bruce shot the victim, but later changed her story and identified Johnson. Paul McDonald identified Johnson, but his observations of the shooter lasted mere seconds. Ardell McDaniel, who had been drinking alcohol on the night in question, identified Johnson as the shooter at trial. However, he initially could not select Johnson from a photo array. Instead, he narrowed the photos from eight to two photos, and eventually selected Johnson from the photos because he looked "the most familiar of the men involved in the shooting." N.T., 6/1/1992, at 31. The fact that the trial court issued a Kloiber instruction supports the notion that the Commonwealth's identification testimony was not ironclad. Hence, the Commonwealth's evidence was not so overwhelming or unassailable as to deny Johnson the opportunity to present his alibi witnesses at a hearing as he attempts to prove that counsel was ineffective for failing to discover, investigate, and present those witnesses to the jury.

The Commonwealth contends that Johnson's claim necessarily fails because trial counsel offered "unrebutted testimony" at the PCRA hearing that he had no recollection of being informed by Johnson that Handy and White existed. Brief for the Commonwealth at 22. The Commonwealth points out that counsel also testified that he would have interviewed these witnesses had they been brought to his attention. It is true that counsel's testimony went unrebutted at the evidentiary hearing. Yet this was not a result of Johnson's inaction. Rather, as noted earlier, the PCRA court limited that particular hearing to trial counsel's testimony. Johnson was not permitted to call any other witnesses. Despite this initial proscription, at the conclusion of the hearing, the PCRA court offered Johnson the opportunity to present additional testimony at a future time.

That occasion never came to pass. Instead, before any other hearings were scheduled, defense counsel withdrew, the Commonwealth stipulated to a new penalty phase hearing, and the PCRA court dismissed the balance of Johnson's claims without first holding another evidentiary hearing.

The record is unclear as to what steps, if any, Johnson took to coordinate with the Commonwealth to select a new date for an evidentiary hearing before the PCRA court dismissed the remainder of his claims. What is clear is that, at all times, Johnson maintained that he was entitled to relief and requested evidentiary hearings to satisfy his evidentiary burden. In fact, Johnson requested a hearing as recently as 2014, when he filed his amended PCRA petition in response to this Court's remand for reconstruction of the record. See Amended PCRA Petition, 5/15/2014, at 12 ¶42, 16 ¶52. Because Johnson has maintained his request for a full evidentiary hearing from the inception of the post-conviction proceedings, we cannot accept the Commonwealth's argument that Johnson's claim should be denied outright based exclusively upon trial counsel's testimony. In sum, Johnson's claim that trial counsel failed to investigate, discover, and produce Handy and White as alibi witnesses raises genuine issues of material fact that warrant an evidentiary hearing. We remand this case only for a hearing on the purported alibi witnesses. We agree with the PCRA court that Johnson has not demonstrated that he is entitled to a hearing with regard to the fact witnesses.

As a final matter, Johnson also argues that, even if he is not entitled to relief on any individual claims, he nonetheless is entitled to relief based upon the cumulative prejudicial effect of all of his allegations of error. This Court repeatedly has held that "no number of failed claims may collectively warrant relief if they fail to do so individually." Commonwealth v. Washington, 927 A.2d 586, 617 (Pa. 2007). However, if counsel is

found to be ineffective in more than one instance, the question of whether prejudice resulted may be tallied cumulatively. Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009) ("Furthermore, we also recognize that if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation.") (citation omitted). Here, however, we have not determined that counsel was deficient at all, let alone in multiple ways. Indeed, most of our rulings above were premised upon the first two prongs of the ineffective assistance of counsel test. It is clear that Johnson is not entitled to a cumulative assessment of prejudice.

For the foregoing reasons, we vacate the order below only insofar as it addresses trial counsel's failure to discover and present the proposed alibi witnesses, and we remand to the PCRA court for proceedings consistent with this Opinion.

Justices Baer and Dougherty join the opinion.

Chief Justice Saylor files a concurring opinion, joining the opinion with respect to Parts I, II, III and IV(A), (E) and (F), which is joined by Justices Todd and Donohue as pertains to Part IV(D).

Justice Todd files a concurring opinion in which Justice Donohue joins, joining the opinion except with respect to Part IV(D).