J-S24033-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHNATHAN KEITH GODINES | : | |
| | : | |
| Appellant | : | No. 1586 WDA 2016 |

Appeal from the PCRA Order October 4, 2016
In the Court of Common Pleas of Fayette County
Criminal Division at No(s): CP-26-CR-0000524-2012

BEFORE:   PANELLA, STABILE, JJ., and STEVENS, P.J.E[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED APRIL 19, 2017**

Appellant, Johnathan Keith Godines, appeals from the October 4, 2016, order entered in the Court of Common Pleas of Fayette County denying his first petition filed under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546, following an evidentiary hearing.  After a careful review, we affirm.

The relevant facts and procedural history were previously set forth by this Court on direct appeal, in part, as follows:

> [T]he trial evidence establishes that the crimes occurred on November 15, 2011, in the city of Brownsville, Fayette County, Pennsylvania. [Appellant], wearing a dark colored hooded sweatshirt, was observed by several trial witnesses as he approached the now-deceased victim as the latter sat in the

_____

[*] Former Justice specially assigned to the Superior Court.

driver's seat of his car, which was parked curbside along a street in Brownsville. Loud [ ] arguing attracted the attention of Commonwealth witnesses Megan Boger and Tabitha Zieglar, who each testified that they observed [Appellant] kicking the side of the victim's car six or seven times. N.T., [Trial, 10/7/13,] pp. 30, 45–46, 49, 56-57.

Each witness then saw [Appellant] open the driver's door of the victim's car and drag the victim out to the ground, and then [Appellant] leaning and shifting his body toward the victim in such a way that both of them knew [Appellant] was kicking the man on the ground, with force, at least six times. *Id.* pp. 23–24, 30–32, 41–42, 45–47. Each of these named witnesses then saw [Appellant] walk away. *Id.* pp. 36–37, 48, 104. The women observed the victim get up from the ground and slowly pursue [Appellant] around a building and out of their sight. *Id.* pp. 25, 37, 39–40, 48, 59.

Jerry Abbey, a bartender in the Antique Bar and Grill, in front of which business a further altercation took place, also testified as a Commonwealth witness. *Id.* pp. 102–105, 110–11. He told the jury that he could see [Appellant], whom he knew, kicking and swinging his fists at something approximately fifteen times. *Id.* Three other Commonwealth witnesses, Fawn Petrosky and her daughters, Emma and Brianna, testified that they saw an elderly man (the victim) cross the street in front of them as they were driving through Brownsville, *id.* pp. 70, 77, 82, 92–93, and then heard loud argumentative voices which drew their attention to the scene behind them. *Id.* There they could see [Appellant] swinging his arm to punch the older victim several times. *Id.* pp. 71–72, 84–85, 93. [Appellant], taller than the victim to begin with, appeared to be standing on the street's curb so as to be higher up than the victim. *Id.* p. 85, 94. Brianna Petrosky observed the older man trying to protect himself by ducking down and putting his hands up over his head, while [Appellant] punched downward at him in a chopping motion. *Id.* pp. 94–95. Emma Petrosky then used her cell phone to call 9–1–1 to report the incident. *Id.* p. 85.

A short time later, witnesses Boger and Zieglar, who were still in the area of Brownsville where they had seen [Appellant] pull the victim out of his car and kick him in the street, saw the elderly victim returning to his car. At that time, they could see that he had a split lip and blood on his mouth, as well as a scratch on the side of his face and dirt and pebbles on his body. *Id.* pp. 37–38, 49. The victim was limping and appeared to be

hurt. *Id.* p. 50. In addition, he was acting as though he was not sure what was going on. *Id.* When the first responding police officer, Brownsville Police Officer Robert Mammarella, arrived on the scene, he was able to have a coherent conversation with the victim, but his condition noticeably deteriorated before the ambulance arrived. *Id.* p. 190. The victim was transported to a hospital in Pittsburgh, where he died on December 1, 2011.

At trial, the Commonwealth's expert, forensic pathologist Doctor Todd Luckasevic, who performed the autopsy on December 2, 2011, testified that the victim suffered a thalamic hemorrhage and associated infarction with superimposed acute hemorrhage. *Id.* p. 238. He went on to opine that the victim likely had an adrenaline rush while he was being assaulted, and the adrenaline rush caused an increase in his blood pressure which in turn led to the thalamic bleed. *Id.* p. 140. He then said there was also an infarction in the back of the brain that cut off the blood supply and caused necrosis there, *id.* pp. 141, 143, which occurred when atherosclerotic plaque broke off and lodged in an artery, clogging it. *Id.* p. 148. [The victim] contracted pneumonia at some point, and the acute cause of death was the severe bronchopneumonia. *Id.* p. 150.

Nevertheless, Doctor Luckasevic ruled the death a homicide based on the chain of events, e.g., the assault caused him to be taken to one hospital where he exhibited signs of the thalamic hemorrhage, leading to him being life-flighted to Mercy Hospital in Pittsburgh, where he was placed on life-supporting mechanisms. *Id.* p. 151. The thalamic bleed caused weakness on his left side, which caused the victim to aspirate, in turn causing the acute bronchopneumonia. *Id.* p. 152. The expert acknowledged that the victim had a medical history including hypertension/high blood pressure, atrial fibrillation for which he was prescribed the drug Coumadin, and related changes to the heart muscle and the kidneys. *Id.* pp. 153–54.

[Represented by Attorneys Michael Garofalo and Benjamin Goodwin of the Public Defender's Office, Appellant proceeded to] a...jury trial wherein he was found guilty on October 10, 2013, of Third Degree Murder at Count I, Aggravated Assault at Count II, Simple Assault at Count III, Recklessly Endangering Another Person at Count IV, and lastly at Count V, Disorderly Conduct, as the result of a physical altercation and the subsequent death of the other participant, John Eicholtz ["the victim"]. [Appellant] was sentenced on October 17, 2013, at Count 1, Murder in the

> Third Degree, to a term of imprisonment of not less than twenty years nor more than forty years, and at Count 2, Aggravated Assault, to a concurrent term of not less than ten years nor more than twenty years. At Counts 3, 4, and 5, the Court accepted the guilty verdicts without the imposition of further penalty.

*Commonwealth v. Godines*, 1904 WDA 2013, 2014 WL 10752251, at *1– 3 (Pa.Super. filed. Dec. 1, 2014) (unpublished memorandum).

Appellant filed a post-sentence motion, which the trial court denied, and Appellant then filed a direct appeal to this Court. On appeal, Appellant challenged the sufficiency and weight of the evidence supporting his convictions, contended the prosecutor improperly committed misconduct during closing arguments, averred the trial court's jury instructions were improper, argued the trial court erred in permitting the Commonwealth to introduce at trial a recorded jail conversation between Appellant and another person, presented a challenge to the discretionary aspects of his sentence, and contended the trial court's concurrent sentence for aggravated assault was illegal since the conviction merged with third degree murder for sentencing purposes.

This Court agreed with Appellant's legality of sentencing claim, but found his remaining claims to be either waived or meritless. Accordingly, by memorandum filed on December 1, 2014, we vacated the judgment of sentence as to aggravated assault, but affirmed in all other respects. *Id.* Appellant did not file a petition for allowance of appeal with our Supreme Court.

- 4 -

On or about September 30, 2015, Appellant filed a timely *pro se* PCRA petition, and James V. Natale, Esquire, was appointed to represent Appellant. Attorney Natale filed an amended PCRA petition, and the PCRA court permitted Appellant to employ Dr. Neil Hoffman, a medical expert in pathology, to review the existing medical records pertaining to the victim's murder.

Subsequently, Attorney Natale filed an emergency motion to withdraw as counsel based on a conflict of interest. The PCRA court granted Attorney Natale's motion and appointed Dianne Zerega to represent Appellant. On July 27, 2016, Appellant proceeded to a PCRA hearing, and by order and opinion filed on October 4, 2016, the PCRA court denied Appellant's PCRA petition. This timely counseled appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant presents the following sole issue for our review:

> Was trial counsel ineffective for failing to find and present testimony from a forensic pathologist to testify as to the cause of death of the victim, since his death occurred as a result of a hypertensive event that resulted in the victim dying of pneumonia?

Appellant's Brief at 6.

> When reviewing the denial of a PCRA petition, we must determine whether the PCRA court's order is supported by the record and free of legal error. Generally, we are bound by a PCRA court's credibility determinations. However, with regard to a court's legal conclusions, we apply a *de novo* standard.

*Commonwealth v. Johnson*, --- Pa. ---, ---, 139 A.3d 1257, 1272 (2016)

(quotation marks and quotations omitted).

Furthermore,

In order to be eligible for PCRA relief, the petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in Section 9543(a)(2), which includes the ineffective assistance of counsel. 42 Pa.C.S.[A.] § 9543(a)(2)(i).

It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. To prevail on an ineffectiveness claim, the petitioner has the burden to prove that (1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance. The failure to satisfy any one of the prongs will cause the entire claim to fail.

*Commonwealth v. Benner*, 147 A.3d 915, 919–20 (Pa.Super. 2016)

(quotation marks, quotations, and citations omitted).

Regarding the prejudice prong, a petitioner must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction....

We need not analyze the prongs of an ineffectiveness claim in any particular order. Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case. Finally, counsel cannot be deemed ineffective for failing to raise a meritless claim.

*Johnson*, --- Pa. at ---, 139 A.3d at 1272 (citations omitted).

Appellant argues his trial attorneys were ineffective in failing to find and present testimony of a forensic pathologist, such as Dr. Hoffman, to

testify as to the cause of death of the victim. Appellant admits that his trial attorneys presented the testimony of the victim's treating neurologist, Dr. Maxim Hammer, and that Dr. Hammer's trial testimony was consistent with Dr. Hoffman's report, which PCRA counsel entered into evidence at the PCRA hearing. Appellant's Brief at 11-12. Nevertheless, Appellant avers that instead of offering the testimony of Dr. Hammer his trial attorneys should have presented the testimony of a forensic pathologist, such as Dr. Hoffman, to rebut the testimony of the Commonwealth's expert witness, Dr. Todd Luckasevic, who is a forensic pathologist. Assuming, *arguendo*, there is arguable merit to the underlying claim, we agree with the PCRA court that Appellant has not met the remaining prongs of the ineffectiveness test. **See Benner**, **supra**.

As indicated *supra*, Appellant's trial attorneys cannot be deemed ineffective unless their chosen actions (or inactions) lacked a reasonable basis. **See Benner**, **supra**. As our Supreme Court has held:

> Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. A claim of ineffectiveness cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.

**Commonwealth v. Puksar**, 597 Pa. 240, 256-57, 951 A.2d 267, 277 (2008) (quotation marks, quotation, and citation omitted).

In the case *sub judice*, in explaining the reasons the defense presented the testimony of Dr. Hammer, as opposed to the testimony of a

forensic pathologist, to rebut the Commonwealth's expert, Attorney Garofalo

testified as follows on direct-examination at the PCRA hearing:

**Q:** And upon your review of [Dr. Luckasevic's] report did you consider calling a medical expert of your own?

**A:** We had discussed that, and strategically when we were able to get Dr. Hammer. . .to come and testify as a fact witness, the treating physician and head of stroke treatment at the hospital where the victim was treated, we had opted not to try and retain a pathologist based upon what we had discussed with Dr. Hammer and based upon what was already in the report of the pathologist, Dr. Luckasevic.

**Q:** In your conversations with Dr. Hammer what was it, do I understand that you felt that Dr. Hammer's testimony was sufficient to rebut Dr. Luckasevic's?

**A:** Yes. We also had spoken to two other doctors. We spoke to Dr. Philip Reilly together. [Attorney] Goodwin and I went down to the Coroner's Office and met with him and discussed with him what our theory of the case was and I believe, I wasn't part of the conversation, but Mr. Goodwin informed me that he spoke directly with Dr. Wecht about the case as well and then I had, as we were dividing up the work, I'm the one that spoke to Dr. Hammer.

**Q:** And upon talking to these individuals why did you decide, what was your thought process behind deciding that Dr. Hammer was sufficient?

**A:** Well based on the fact that he was the head of the department that treats stroke suffers and that the testimony that he provided and everything that he had told us in advance, which he testified to, was that had the family not stopped treatment of [the victim,] that while he would have lived a life with some impairments as a result of the stroke, he would have survived and likely would have been alive even at the time of trial, if they had continued medical treatment.

**Q:** And so Dr. Hammer then based on your understanding of his testimony and his opinion was essentially that the cause of death was the family choosing to end life supporting treatment.

**A:** Correct. Providing comfort measures only I think is what the actual directive was but, again, I haven't read the file in three years.

***

**Q:** And Dr. Hammer was board certified. Is that correct?

**A:** Yes, he was the head of Stroke Treatment at, I think it was Presbyterian, Presbyterian or Mercy Hospital, I don't remember which one. It was a UPMC Hospital.

**Q:** Was Dr. Hammer the head of the stroke division at the hospital where...the victim was treated and ultimately died?

**A:** Yes, that's my understanding....

**Q:** And was Dr. Hammer actually listed as the supervising physician in [the victim's] case?

**A:** I believe that he was....

**Q:** And did the fact that Dr. Hammer rather than Dr. Luckasevic or any other doctor, the fact that he had actual experience in dealing with this case, [the victim's] treatment while he was still alive, did that play in your decision to use him?

**A:** Yeah, that made us think that it was pretty weighty testimony.

N.T., PCRA hearing, 7/27/16, at 5-9.

Attorney Garofalo's co-counsel, Attorney Goodwin, confirmed at the PCRA hearing that he and Attorney Garofalo decided to call Dr. Hammer as an expert trial witness for the defense since "[h]e was actually the individual who either treated [the victim] or who had supervised the treatment of [the victim]. He was the head of, I think stroke care or cardiovascular disease at a UPMC Hospital." *Id.* at 16. Attorney Goodwin noted that Dr. Hammer was presented as a defense witness because he was willing to, and in fact did, testify at trial that but for the victim's family's direction to discontinue the administration of antibiotics, "[c]hances are that he would [still] be alive[.]" N.T., Trial, 10/7/13, at 348; N.T., PCRA hearing, 7/27/16, at 17.

Based on the aforementioned, we agree with the PCRA court that Appellant's trial attorneys' "decision to employ Dr. Hammer as the defensive expert witness was eminently reasonable and clearly designed to effectuate [their] client's best interest."[1] PCRA Court's Opinion, filed 10/4/16, at 4.

Finally, it bears mentioning that Appellant has failed to demonstrate that he was prejudiced by his trial attorneys' failure to present the testimony of a forensic pathologist, such as Dr. Hoffman, on behalf of the defense. We find persuasive the PCRA court's rationale in this regard:

_____

[1] Additionally, as the PCRA court cogently noted, even in situations where defense attorneys have not presented experts of their own to rebut Commonwealth witnesses, our appellate courts have declined to find ineffectiveness if the defense attorneys were able to effectively cross-examine the prosecution's experts. *See Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638 (2009) (finding defense counsel's trial strategy reasonable in first-degree murder trial where the defense did not present expert witnesses to rebut the Commonwealth expert on issue of whether the defendant raped the victim since defense counsel sufficiently cross-examined the Commonwealth expert); *Commonwealth v. Copenhefer*, 553 Pa. 285, 307, 719 A.2d 242, 253 (1998) ("Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony.") (citations omitted)).

In the case *sub judice*, the PCRA court concluded that "review of the trial transcript, as well as the testimony at the PCRA hearing, shows that trial counsel w[ere] quite effective in [their] cross-examination of Dr. Luckasevic[.]" PCRA Court's Opinion, filed 10/4/16, at 4 (indicating trial counsel established on cross-examination that "the victim did not die of trauma from physical blows, the victim had pre-existing medical issues that could have caused his stroke from anger or elevated adrenaline rush, that the blows from the assault cannot be proven to have triggered such an event, and the actual cause of death was pneumonia"). We agree with the PCRA court's analysis in this regard.

> The Court...gives no weight to PCRA counsel's argument that merely adding Dr. Hoffman as a witness to provide cumulative testimony, solely because he is a forensic pathologist, "would have been successful in creating some doubt and [...] but for counsel's failure to get an equally certified [forensic pathologist...] the outcome would have been different." The Court finds that [Appellant] [has demonstrated] no prejudice whatsoever from trial counsel's strategic decision to use the victim's treating physician as the defensive expert witness, rather than engaging a forensic pathologist simply because he is a forensic pathologist.

PCRA Court's Opinion, filed 10/4/16, at 5 (quotation omitted).

For all of the foregoing reasons, we conclude that Appellant has failed to demonstrate that his trial attorneys were ineffective, and accordingly, we affirm the PCRA court's denial of Appellant's first PCRA petition on this basis.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/2017

- 11 -