J-A32044-17

## NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| CRAIG DAVID ICE, | : | |
| | : | |
| Appellant | : | No. 265 MDA 2017 |

Appeal from the PCRA Order January 19, 2017
in the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0003118-2011

BEFORE:    OTT, DUBOW, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:                **FILED MARCH 06, 2018**

Craig David Ice (Appellant) appeals from the January 19, 2017 order

that denied his petition filed pursuant to the Post Conviction Relief Act (PCRA),

42 Pa.C.S. §§ 9541-9546.  We affirm.

The PCRA court offered the following summary of the evidence offered

at the trial that resulted in Appellant's underlying convictions.

> The victim, EA …, testified that she first met [Appellant] in February 2007.  [Appellant] was [the boyfriend of CA, who is EA's mother,] and he moved into CA's home with EA shortly thereafter. [Appellant] and CA married [on] May 23, 2010.
>
> In the summer of 2009, CA and [Appellant] moved into a blue house, when EA was twelve years old, which they remained in for about one year.   EA testified that after a couple of months in the blue house, [Appellant] began to act and touch her inappropriately.  The first instance occurred when they were both sitting on a couch.  EA was doing homework while her mother was at work.  EA got up to get something and [Appellant] got up right after her and pulled down her shorts past her knees.  About a half

*Retired Senior Judge assigned to the Superior Court.

hour later, while EA was lying on the couch watching TV, [Appellant] stood between her and the TV and pulled down his pants. EA immediately turned her head and [could not] tell whether [Appellant] had pulled down his underwear. She ran upstairs to her bedroom. She then went to her mother's bedroom because she could lock it. [Appellant] later came up to the room and told her that he had only been "playing" and that "it wasn't a big deal."

EA recounted a second incident at the blue house occurring when she was twelve years old. EA testified that while her mother was away, she was in [a] room with [Appellant] used for storage. She was wearing an oversized shirt with a built-in bra and [Appellant] suggested that EA fill the bra with aquarium stones located in the room. EA filled in one side of the bra with stones after which [Appellant] placed his hand into the bra and touched her breast and nipple. She told him to stop and he quickly removed his hand. [Appellant] told her he was only playing, that it was no big deal and not to tell her mom.

In the summer of 2010, after they had married, CA and [Appellant] moved with EA to a home on Cherrington Drive. EA testified that a few days after the move she was unpacking with [Appellant] while her mother was away. [Appellant] told her to say the "F" word and EA refused. She recalled that [Appellant] began to chase her, which she initially perceived as playful behavior. She ran into a closet and laid down on the ground. [Appellant] followed and kneeled down next to her. He first touched her breasts under her shirt. He then tried to put his right hand down under the top of her shorts. EA told him to stop and grabbed a book from a nearby shelf and placed it in her pants, blocking his reach. Undeterred, [Appellant] reached his right hand up through the bottom of her shorts and over her underwear, pinching EA's vaginal area. EA stated that his hand remained there for about a minute. During the incident [Appellant] continued to try to convince EA to use the "F" word. EA stated that she repeatedly told [Appellant] to stop and at one point reached up and bit his left shoulder hard enough to leave a bruise. She eventually yelled at him three or four times to "get the fuck off of me" and he eventually did so.

EA also testified about a fourth incident, occurring at the Cherrington Drive home. In the summer or early fall of 2010, EA

got out of a shower from a bathroom connected to her bedroom, after which [Appellant] knocked on her door and said he lost his phone. EA volunteered to call his phone and discovered it on top of her TV. [Appellant] told her [he] had been videotaping the dog with it. EA, who suspected he had been videotaping her, indicated that [Appellant] had no reason to have his phone in her room noting she had never seen it there, that [Appellant] did not use her charger, that she had never seen [Appellant] videotape the family dog and that the family dog never spent time in her bedroom. She nevertheless admitted that she could not tell if the phone had been videotaping.

EA did not tell her mother about any of the four incidents (pulling pants down near couch, touching breast in storage room, touching breasts and vagina in closet and leaving phone in bedroom) because she [did not] think her mother would believe her. She testified that her mother had told EA that she was very happy living with [Appellant] and EA [did not] want to upset that. EA testified that her mother would generally take [Appellant's] side when there was conflict between EA and [Appellant]. EA also testified she told no one else about any of the incidents at the time they happened other than a close family friend, Shawna Messersmith, whom she told about the phone in the bedroom. She did not tell Messersmith about the other incidents because EA assumed Messersmith would tell her mother, and her mother would not believe her.

On December 10 or 11, 2010, CA informed EA and EA's grandmother that [Appellant] was having an affair. EA described CA as distraught and that CA intended to kick [Appellant] out of the house. While sitting with her grandmother, EA announced to her grandmother that she (EA) was going to put [Appellant] in jail. Her grandmother inquired as to why and EA confessed that [Appellant] had hurt her (EA) and explained some of what [Appellant] had done. The grandmother accused EA of lying, which EA denied. They both approached CA and EA told her mother that [Appellant] had hurt her. EA decided to tell her mother because she thought her mother now saw [Appellant's] "true colors" and would believe her. CA called the police immediately and EA was interviewed that evening and told police about the incidents….

After police were notified, EA was scheduled for an interview at the Children's Resource Center ("CRC") for December 16, 2010. In the days leading up to the interview, CA asked EA to provide specifics about what [Appellant] did to her. EA sensed her mother did not believe her and asked her mother if she missed [Appellant] and wanted to get back together with him. CA admitted she did. EA decided that since her mother did not believe her and because she wanted to protect her mother and make her happy, EA would lie during the CRC interview. EA followed through and denied all the allegations at the interview, which was videotaped and later played at trial for the jury. EA told the CRC interviewers that she initially accused [Appellant] of touching her because she was mad after hearing about [Appellant's] affair and wanted revenge. She also told them she was motivated to make up the allegations because she [did not] want a father figure in her life and liked having just her mother. Finally, she claimed she [did not] want to see an innocent man put behind bars. EA told the interviewers that she was prompted to make up the allegations about being touched from having read it in a book. EA testified at trial that her mother never told her what to say to the CRC interviewers.

EA's CRC interview was watched on closed circuit TV by Sue Kolanda, the Coordinator of the Child Abuse Prosecutor Unit in the Dauphin County District Attorney's Office, and by Detective Michael Mull of the Susquehanna Township Police, who was the investigating officer. Kolanda testified that she had been told prior to the interview that EA might recant her allegations. Kolanda watched the video and was concerned because EA was "robotic," exhibiting a very flat affect. After the interview, she and Detective Mull sought out EA. Kolanda told her she was concerned for her. Kolanda asked EA a number of specific questions about the book EA had mentioned in her interview, including where, when and how she got it. Kolanda stated that EA became more nervous with each question she was unable to answer[,] and Kolanda believed there was no book. Kolanda also asked about a comment EA made during the CRC interview, which was that EA said [Appellant] makes her mom happy. Kolanda told EA that she was worried for her since EA may be going back to the same situation and live with [Appellant] again. According to Kolanda, EA then admitted that her mother and [Appellant] were discussing getting back together. Kolanda told EA to contact her if her allegations against [Appellant] were "legit."

- 4 -

EA testified that Kolanda and Detective Mull had approached her following her CRC interview and that Kolanda asked her the name of the book she read about inappropriate touching and from which library she got it. EA admitted she had no answers and assumed Kolanda and Detective Mull knew she had lied to the CRC interviewers.

A few days after the CRC interview, EA testified at a protection from abuse ("PFA") hearing in Dauphin County. She testified at the hearing that she had lied about [Appellant] touching her, explaining that she was mad at [Appellant] for cheating on her mother. EA explained at trial that at the time, her mother was trying to get back together with [Appellant], which is why she lied at the PFA hearing.

EA testified that her mother remained very upset and sad about her situation with [Appellant] throughout the holidays, which made EA sad and hurt for her mother. Around this time, CA attempted suicide over her situation with [Appellant]. EA then went to live with Shawna Messersmith for a few weeks in early January 2011. EA testified that while staying with Messersmith, she confessed the details of the incidents with [Appellant].

Messersmith testified that she was a close friend of CA[], had known EA since she was an infant and that EA spent considerable time in her home. She recalled that a few weeks prior to December 2010 (when EA initially brought her allegations against [Appellant]), EA told her about the incident where [Appellant] pulled down his pants and that EA had turned away from him. EA also told her about [Appellant] suspiciously leaving his phone in her room, pointed at her bathroom door. Messersmith recalled that EA told her to promise she would not tell her mother. Messersmith claimed she was considering going to authorities when EA's initial allegations came out. Messersmith also testified that on one occasion she saw a bruise on [Appellant]'s shoulder which [Appellant] claimed was caused by a bite from the family dog but which to Messersmith did not look like a dog bite.

Messersmith testified that after CA attempted suicide and during the time EA was living with her, EA told her about the four incidents with [Appellant]. These included the two [Messersmith] had already heard about (pulling pants and phone in bedroom), in

addition to the two others, involving [Appellant] reaching into [EA's] bra to pull out rocks and also trying to reach into her shorts.

Detective Mull testified that sometime after the CRC interview he received information from people close to EA that her initial report to the police was true. He contacted CA and they set up a meeting with EA for February 9, 2011 at the police station. Detective Mull later received a message that EA was unable to make the appointment and he and Kolanda volunteered to meet at [EA's] home. Upon their arrival, they found EA locked in her bathroom, refusing to open the door or respond to them. Detective Mull managed to open the lock and they found EA sitting in a ball in the bathroom closet, sobbing.

Detective Mull left to attend to CA and Kolanda stayed in the bathroom with [EA], trying to comfort her. Kolanda talked with EA for a while and was able to get her to sit up. EA's grandfather, with whom EA has a good relationship, joined them. He told EA she needed to tell the truth, whatever it was. EA got up from the closet floor and hugged her grandfather. Kolanda told EA they needed to move forward at which point EA told her that [Appellant] had done things to her. EA agreed to come out and talk. Kolanda and Detective Mull testified that EA's demeanor changed dramatically after she agreed to talk. EA described the details of the incidents to Kolanda and Detective Mull, the same ones she had initially described for police in December 2010.

EA testified that when Kolanda and Detective Mull arrived at her home she hid in her bathroom closet and locked the door. She testified that she intended "to keep lying" and deny [Appellant] had touched her in order to protect her mother, who still wanted to get back together with [Appellant]. EA testified, however, that after Kolanda talked with her and made her feel comfortable, she admitted to Kolanda she had lied at the CRC interview.

Following trial, the jury found [Appellant] to have inappropriately touched EA as she described for two of the four incidents, including the incident with the aquarium rocks in the storage room when EA was twelve years old and the [incident] in the bathroom closet when EA was thirteen years old. The jury found [Appellant] not guilty of crimes related to the incident where [Appellant] pulled down both EA's and his own pants near the

couch as well as the incident where [Appellant] allegedly videotaped EA in her room with his phone. …

PCRA Court Opinion, 1/19/2017, at 2-6 (quoting Trial Court Opinion, 5/2/2013, at 2-7) (footnote and citations omitted).

Following a sentencing hearing, the trial court found Appellant to be a sexually violent predator, and sentenced him to an aggregate term of 25 to 50 years of incarceration.[1] This Court affirmed Appellant's judgment of sentence, finding no merit to his challenges to the constitutionality of his mandatory minimum sentences, the weight of the evidence, the admission of Kolanda's testimony, or the admission of Messersmith's testimony. **Commonwealth v. Ice**, 102 A.3d 536 (Pa. Super. 2014) (unpublished memorandum). On October 7, 2014, our Supreme Court denied Appellant's petition for allowance of appeal. **Commonwealth v. Ice**, 101 A.3d 785 (Pa. 2014).

---

[1] Given that Appellant had a prior conviction for a sexual offense (he pled guilty to incest in 2001), the aggregate sentence was composed of the following terms: "indecent assault of person less than thirteen years old (Count 2), 27 to 84 months; indecent assault of person less than sixteen years old (Count 3), 27 to 84 months consecutive to Count 2; unlawful contact with a minor (Count 4), a mandatory 25 to 50 years concurrent with Count 2; corruption of minors (Count 5), 16 to 84 months consecutive to Count 2; corruption of minors (Count 6), 16 to 84 months consecutive to Count 2; and unlawful contact with a minor (Count 8), mandatory 25 to 50 years concurrent with Count 4." PCRA Court Opinion, 1/19/2017, at 1-2. The trial court, upon consideration of Appellant's post-sentence motion, vacated one of the indecent-assault sentences and resentenced him to 12 to 24 months on that count; it did not impact his aggregate sentence. **Id.** at 6.

Appellant timely filed a PCRA petition on June 3, 2015. "After a number of delays, including the replacement of [Appellant's] first two court-appointed attorneys, [Appellant's] third PCRA attorney filed a supplemental petition." PCRA Court Opinion, 1/19/2017, at 7. Therein, Appellant claimed, *inter alia*,[2] that trial counsel was ineffective in (1) failing to discover that Shawna Messersmith had criminal charges pending against her when she testified at Appellant's trial; and (2) not calling Cynthia Dickason and Bonnie Aulthouse as exculpatory defense witnesses. PCRA Petition, 2/19/2016, at ¶ 17.

The PCRA court held a hearing on the petition on July 15, 2016. Appellant testified, and also offered testimony from Aulthouse, Dickason, and Jessica Bush, Appellant's trial counsel. Relevant to this appeal, the Commonwealth called John Canavan, the ADA who prosecuted Appellant's case, and Phillip Kirchner, the ADA who prosecuted Messersmith's case. At the close of the hearing, the PCRA court took the matter under advisement.

By order and accompanying opinion entered January 19, 2017, the PCRA court denied Appellant's petition. Appellant timely filed a notice of appeal. The PCRA court did not order Appellant to file a statement of errors complained of on appeal; it did file a statement pursuant to Pa.R.A.P. 1925(a) directing this Court to its January 19, 2017 opinion for the reasoning behind the appealed-from order. Appellant presents the following issue for our review:

---

[2] Appellant does not argue on appeal that the PCRA court erred regarding its denial of any of the other claims raised in the petition.

> Whether Appellant was deprived of his constitutional right to effective assistance of counsel when his trial attorney failed to properly investigate exculpatory information and failed to call two exculpatory witnesses in violation of Appellant's right to effective counsel under the 6th amendment to the United States constitution as well as article I section 9 of the Pennsylvania constitution?

Appellant's Brief at 4 (unnecessary capitalization omitted).

"This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." **_Commonwealth v. Rizvi_**, 166 A.3d 344, 347 (Pa. Super. 2017).

Appellant's arguments all involve claims of ineffective assistance of counsel. Counsel is presumed to be effective. **_Commonwealth v. Simpson_**, 112 A.3d 1194, 1197 (Pa. 2015). "To establish ineffectiveness of counsel, a PCRA petitioner must show the underlying claim has arguable merit, counsel's actions lacked any reasonable basis, and counsel's actions prejudiced the petitioner. Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different." **_Commonwealth v. Jones_**, 71 A.3d 1061, 1063 (Pa. Super. 2013) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." **_Commonwealth v. Daniels_**, 963 A.2d 409, 419 (Pa. 2009).

We first consider Appellant's claim that trial counsel should have discovered Shawna Messersmith's pending criminal charges prior to her

- 9 -

testifying against Appellant. Appellant contends that his claim has arguable merit because counsel in fact failed to discover that Messersmith had charges pending against her, the most serious charges against her were dropped shortly after she testified against Appellant, and counsel could have impeached her by questioning her about her motive for cooperating with the Commonwealth. Appellant's Brief at 9. Appellant further contends that there was no reasonable basis for counsel to rely upon the Commonwealth's representation that it lacked exculpatory information[3] and pursue an impeachment strategy of sole reliance upon the contradictory statements EA made in the CRC video. *Id.* at 10. Finally, Appellant contends he was prejudiced because "it is possible that [] Messersmith's unimpeached testimony had a combined effect with other Commonwealth testimony in the minds of the jurors due to spillover from these acquitted charges...." *Id.*

The PCRA court rejected Appellant's claim. The court determined that counsel had a reasonable basis for failing to conduct an investigation, as "Messersmith was called as a last-minute witness," PCRA Court Opinion, 1/19/2017, at 12, and "counsel reasonably relied upon the Commonwealth's representation to her that it would provide Messsersmith's relevant criminal

---

[3] In the PCRA court, Appellant pursued a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), regarding the Commonwealth's failure to disclose the information about Messersmith's pending charges. The PCRA court denied the claim based upon lack of prejudice, *see* PCRA Court Opinion, 1/19/2017, at 11-14, and Appellant does not challenge that ruling on appeal.

record history." **_Id._** at 14. Assuming *arguendo* that counsel lacked a reasonable basis, the PCRA also determined that Appellant was not prejudiced by counsel's failure to discover the information:

Any impeachment evidence offered against Messersmith concerning the pending charges, while relevant and admissible, would not have undermined confidence in the outcome of this trial had it been presented. First, the Commonwealth presented credible evidence that Messersmith was not offered any type of deal or any promise of leniency concerning her pending criminal charges in exchange for testifying on the Commonwealth's behalf. According to the attorney who prosecuted Messersmith's case and accepted her guilty plea one week following her testimony in this case, Messersmith was not offered a favorable plea deal but instead received terms similar to those offered other persons facing similar charges. He further testified that he was not contacted by anyone in the District Attorney's Office to treat her leniently. Thus, had the defense impeached Messersmith about the fact of her pending criminal charges, the Commonwealth would have been able to respond with credible evidence, through Messersmith or other rebuttal witnesses, that Messersmith was not and would not be receiving any favorable treatment for testifying on the Commonwealth's behalf. Thus, the value of the pending charge evidence for impeachment purposes was negligible.

Second, Messersmith was offered by the prosecution primarily to provide evidence that the victim EA made a statement to her that was consistent with some of what EA originally told police, before recanting. Messersmith indeed testified at trial that a few weeks prior to December 2010, when EA initially brought her allegations against [Appellant], EA confessed to her about the incident where [Appellant] pulled down the victim's pants and then his own pants near the couch and the other incident where [Appellant] suspiciously left his phone in EA's room. Notably, [Appellant] was acquitted of all charges related to these two incidents. Instead, [Appellant]'s convictions arose from two other incidents as alleged by EA; one where [Appellant] reached into her bra in the storage room and touched her breast and the other where he touched her breasts and reached into her shorts in the closet. Messersmith offered no prior consistent statement

testimony with regard to those incidents. Thus, the jury appears to have found EA's testimony, standing alone, sufficiently credible concerning these events and did not rely upon any testimony offered by Messersmith in finding [Appellant] guilty.

PCRA Court Opinion, 1/19/2017, at 13-14 (citations omitted).

The PCRA court's factual determinations are supported by the record. We discern no error of law or abuse of discretion in its conclusions that counsel reasonably relied upon the Commonwealth's representations, and that Appellant failed to prove the prejudice prong of his claim. Appellant was acquitted of the charges to which Messersmith's testimony was relevant. Appellant's speculation that "it is possible" that her testimony could have impacted the jury's decision on the other charges is insufficient to meet his burden of proving that a different outcome is **probable**. *See*, *e.g.*, ***Commonwealth v. Burkett***, 5 A.3d 1260, 1272 (Pa. Super. 2010) ("Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (internal quotation marks and citations omitted)). Therefore, we hold that Appellant has failed to establish his entitlement to relief from this Court on his first claim.

Appellant's remaining arguments concern trial counsel's failure to call Bonnie Aulthouse and Cynthia Dickason as witnesses in his defense. The following legal principles apply.

To be entitled to relief on a claim of ineffectiveness for failure to call a witness, [an] appellant must demonstrate [that]: [1.] the witness existed, [2.] was available, and [3.] willing to cooperate; [4.] counsel knew or should have known of the witness; and [5.] the absence of the witness's testimony prejudiced [the] appellant. A PCRA petitioner cannot succeed on such a claim if the proposed witness'[s] testimony would not have materially aided him. In such a case, the underlying-merit and prejudice prongs of the [ineffective assistance of counsel] test logically overlap. To show prejudice, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's allegedly unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Johnson*, 139 A.3d 1257, 1284 (Pa. 2016) (internal quotation marks and citations omitted).

The PCRA court offered the following summary of the testimony offered at the PCRA hearing regarding this claim.

Bonnie Aulthouse testified that she is a friend of [Appellant] and has known him for about five years. She claimed that prior to trial, while in her home, she overheard EA and EA's mother CA discussing the allegations. Aulthouse claims she heard CA say that EA "lied on the stand." Aulthouse also claimed hearing at the same time EA admit that she lied. Aulthouse also submitted an affidavit in preparation for the PCRA proceeding, in which she wrote: "I overheard the mother state that both she and the complaining witness [EA] lied because they were mad at [Appellant] for having an affair."

Cynthia Dickason, who was having an affair with [Appellant] immediately preceding his arrest, testified that the morning after CA obtained an emergency PFA order against [Appellant], CA called him at a hotel where he was staying with Dickason. She overheard CA tell [Appellant] that "I have got you by the balls, motherfucker." She also saw electronic messages sent between them in which CA wrote of her desire to go through marriage counseling and threatened to either bring charges or make them go away if [Appellant] did or didn't do as she wanted. She

claimed that shortly before trial, she told [Appellant's] attorney about this information but that the attorney did not interview her or seek more details.

\* \* \*

[Appellant's] trial attorney Bush testified that in the course of representing [Appellant], he alerted her about Bonnie Aulthouse. According to what [Appellant] told her, Aulthouse would only be able to provide information concerning [Appellant's] having an affair with Cynthia Dickason and that CA wanted to get back together with him. Given this was not new information, Bush decided not to interview Aulthouse. Bush did, however, contact Dickason numerous times via phone and email and discussed the case "in great detail." Bush decided against calling her as a witness since the only information she would offer was basically that CA was angry at [Appellant] for having an affair, which was not a contested point.

Bush denied ever having been told by anyone, including by [Appellant], that Aulthouse and Dickason each claimed to have heard EA say prior to trial that she was lying. …

PCRA Court Opinion, 1/19/2017, at 9-10 (citations omitted).

The PCRA court held that counsel had a reasonable basis for failing to call Dickason as a witness, determining that Dickason had not told counsel Dickason overheard EA say that Appellant never sexually assaulted her. *See* PCRA Court Opinion, 1/19/2017, at 15 ("This court [] finds credible trial counsel's PCRA testimony that Dickason did not divulge to her that she overheard EA say at some unknown time prior to trial that she was lying about the sexual assault allegations against petitioner. Similarly, the court finds Dickason's PCRA testimony, that she told Bush about such an event[,] not credible.").

Similarly, the PCRA court found that, because counsel reasonably believed that Aulthouse had nothing to add to the defense, she had a reasonable basis for failing to interview her. *See id.* at 16 ("According to Bush, [Appellant] never apprised [Bush] that Aulthouse had any relevant information concerning EA's allegations. According to Bush, [Appellant] told her only that Aulthouse had information that [Appellant] was having an affair with Cynthia Dickason and that CA wanted to get back together with him even after learning about the affair. This was information already known by Attorney Bush and she thus reasonably decided not to interview Aulthouse."). The PCRA court further held that Appellant was not prejudiced by counsel's failure to interview Aulthouse, because her testimony would not have helped the defense.

> At the PCRA hearing, Aulthouse initially testified that at some undisclosed date prior to trial, she was in her own house when she overheard the victim EA and her mother CA discussing the allegations against [Appellant]. According to Aulthouse, she heard CA say that EA "lied on the stand." Prior to trial, the only time EA was "on the stand" would have been at the PFA hearing. At the PFA hearing, EA testified that none of the sexual assault allegations she made against [Appellant] were true. Thus, a reasonable interpretation of Aulthouse's PCRA testimony is that what she heard was the victim's mother state her belief that EA was lying when she denied the sexual assault allegations while "on the stand" at the PFA hearing. This evidence is certainly not favorable to [Appellant]. Instead, it would have corroborated EA's testimony that she lied during the PFA hearing (and also at the CRC interview).
>
> Similarly, Aulthouse testified that during the same event (when she was in her home overhearing the conversation between EA and CA), she heard EA herself admit she lied. This was not

- 15 -

credible testimony inasmuch as in her PCRA affidavit, she made no claim whatsoever that she heard EA say anything. Instead, in her affidavit, Aulthouse said only that she overheard CA state that both CA and EA were lying about the allegations. In any event, even if Aulthouse heard EA herself admit to lying, the PCRA record of Aulthouse' s testimony does not clearly indicate about what EA was allegedly lying. A reasonable interpretation of Aulthouse's PCRA testimony is that EA was affirming the same thing her mother was overheard saying inasmuch as it was part of the same conversation; that is, that EA lied "while on the stand" at the PFA hearing. Again, such evidence is not favorable to [Appellant] but would have instead bolstered EA's testimony. Finally, to the extent Aulthouse accurately heard both CA and EA admit to lying about the allegations, such evidence is of little relevance concerning what CA said since she was not a witness at trial. Concerning EA, that EA lied at some point about her allegations against petitioner was not new information and would have been merely cumulative.

*Id.* at 16-17.

Ignoring the PCRA court's credibility determinations, Appellant argues that there "is no doubt that the first four elements" of the test for ineffective failure to call a witness have been established. Appellant's Brief at 11. He also contends that, despite the PCRA court's factual findings, he has proven the prejudice prong because both witnesses "stated to trial counsel they could testify of their knowledge that the complaining witness and her mother lied about [] Appellant to exact revenge for his affair," and "it is difficult to see how these two witnesses' testimony questioning the complaining witness'[s] credibility would not have helped strengthen [] Appellant's case." *Id.*

Appellant has failed to convince us that the PCRA court erred or abused its discretion. Because they are supported by the record, we will not reverse

the PCRA court's credibility determinations. ***Commonwealth v. Santiago***, 855 A.2d 682, 695 (Pa. 2004) ("We will not disturb the credibility determination of the PCRA court."). Moreover, it was Appellant's burden to prove that the outcome of the trial would have been different had the witnesses testified, not that he merely would have had a stronger case. The constitution requires counsel to offer effective assistance; "optimal representation is not required either by the constitution or common sense." ***Commonwealth v. Eichinger***, 108 A.3d 821, 846 (Pa. 2014) (internal quotation marks and citation omitted). Appellant's witness claims do not merit relief from this Court.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2018