J-A26017-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LESTER JACKSON | : | No. 1709 WDA 2018 |

Appeal from the Order Entered November 16, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0011082-2017

BEFORE: SHOGAN, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY OLSON, J.:                    FILED JUNE 23, 2020

The Commonwealth of Pennsylvania appeals as of right, under Pennsylvania Rule of Appellate Procedure 311(d), from the order entered on November 16, 2018. The subject order granted the motion to suppress that was filed by Lester Jackson (hereinafter "Defendant"). We affirm.

At approximately 4:30 a.m. on September 25, 2015, there was a gunfight outside of Silky's Gentleman's Club in McKees Rocks, Pennsylvania. This gunfight resulted in the deaths of Lamont Evans ("Evans") and Jarrell Green ("Green") and the wounding of another person. As stated in the affidavit of probable cause:

> During the course of the investigation[,] high quality surveillance video was recovered from Silky's Gentleman's Club. The video depicts [Evans] firing one shot at [Green]. Upon Evans firing the shot, Green falls onto the sidewalk in front of [the Club,] dropping an apparent firearm to the sidewalk in the process.

[A third male] . . . is depicted in the video picking up the firearm that Green dropped to the sidewalk and subsequently pursuing Evans around the corner of the building and repeatedly shooting in a reckless manner at him while Evans and others are hiding behind vehicles parked in the parking lot. [This third male] is seen on the video wearing a black baseball style hat emblazoned with a red Polo emblem in the center of the hat and a black colored shirt with dark blue jeans and tan Timberland style boots.

. . .

Evans was found lying [dead] on the ramp that physically connects the south side door entrance of the building to the south parking lot. . . . . [A doctor from the Allegheny County Medical Examiner's Office] ruled [that Evans'] cause of death was [a] penetrating gunshot to [the] trunk and the manner of death was homicide.

Criminal Complaint, 10/15/15, at 2 (some capitalization omitted).

The affidavit further declares that, after watching the surveillance video, Pennsylvania State Board of Probation and Parole Agent Martin Vojacek identified the Defendant as being "the third male" in the video – and, thus, the person shown in the video pursuing Evans around the Club and "repeatedly shooting in a reckless manner at him." Id. at 2-3. According to the affidavit, after watching the video, Agent Vojacek "immediately recognized" the Defendant, due to the fact that Agent Vojacek supervised the Defendant on parole. Id. at 3.

The Defendant was arrested and the Commonwealth later charged him with multiple crimes, including criminal homicide, attempted homicide, and aggravated assault.[1] Prior to trial, the Defendant filed a motion to suppress

_____

[1] 18 Pa.C.S.A. §§ 2501(a), 901(a), and 2702(a)(1), respectively.

"any and all pretrial out of court identifications and any and all in-court identifications made by [Agent Vojacek]." The Defendant's Pretrial Motion, 4/16/18, at 5. The Defendant claimed that suppression was necessary because, during the preliminary hearing, Agent Vojacek testified that he "could not identify [the Defendant] based solely on what was depicted in the video;" the Defendant alleged that Agent Vojacek's "identification of [the Defendant] was tainted by" suggestive police conduct. Id. at 5-7.

The trial court held a multi-day hearing on the Defendant's suppression motion. Within the trial court's later opinion, the trial court thoroughly summarized the evidence presented at the hearing, as well as its impressions regarding the evidence:

> [Agent] Vojacek testified that he learned about the shooting while he happened to be watching the weekend news, and he initiated contact with the Allegheny County Homicide Detectives in order to provide assistance in the investigation. He testified that the news report was the first time he learned about the shooting of [Green], an individual who [Agent] Vojacek did not supervise on parole. He testified that the news report did not mention the Defendant's name. He also testified that no one from law enforcement had reached out to him about the investigation, and that he reached out to them because he had a "potential interest in watching the video of the shooting." [Agent] Vojacek knew that [] Green and the Defendant were known associates.
>
> [Agent] Vojacek's testimony, however, is directly contradicted by his own reports which he authored just days after the shooting. The report authored on [September 30, 2015], just five [] days after the shooting, clearly states that "on [September 28, 2015,] Detective Michael Feeney of the Allegheny County Police Department Homicide Unit contacted the [Pennsylvania Board of Probation and Parole] for assistance in identifying the subject that was involved in the

homicide." The report he authored on [October 5, 2015], a little less than two [] weeks after the shooting, states that "on [September 25, 2015,] notification was received that the [Defendant] was wanted for questioning regarding the homicide of Jarrell Green." Read together, the reports make clear that (i) [Agent] Vojacek received notice on the day of the shooting that the Defendant was wanted for questioning in regards to the shooting, and (ii) [Agent] Vojacek was contacted three [] days after the shooting by the homicide unit for assistance in making an identification of the shooter.

When confronted with these reports, [Agent] Vojacek claimed that his statement regarding Detective Feeney contacting him was merely a "misprint." However, his tone, expression, and demeanor all conveyed to [the trial] court that he was being less than truthful. How [Agent] Vojacek came to be involved in the investigation directly bears on the question of whether the overall procedure created a substantial likelihood for misidentification, and the [trial] court finds the reports to be the most credible piece of evidence in explaining the sequence of events leading up to his identification.

Setting the notification issue aside, [Agent] Vojacek also testified that, prior to watching the surveillance video on [September 29, 2015], he conducted his own Facebook investigation and found a picture of the Defendant and [Green] from the night of the shooting. [Agent] Vojacek admitted that at the time he saw the Facebook picture, he had it in his mind that the Defendant "potentially . . . could have been involved" in the shooting. In other words, [Agent] Vojacek admitted that before viewing the video, he researched the Defendant and saw the clothing he was wearing on the night of the shooting, and he suspected the Defendant's involvement in the shooting before watching the video.

The circumstances surrounding the actual viewing of the surveillance video further enhanced the suggestiveness of the identification procedure. First, when [Agent] Vojacek went to watch the video, he was accompanied by Agent Mozingo, another parole agent who had been his "partner" and who also had "ties" to the Defendant. Two other detectives from Allegheny County were also present in the room at the time the video was played. They all watched the

video together, in the same room, at the same time, while "actively discussing what they were seeing on the video." [Agent] Vojacek also indirectly confirmed that Agent Mozingo was offering "input" about the images on the video.

While [Agent] Vojacek testified that the homicide detectives never indicated that they knew who the Defendant was when they were watching the video together, the fact that [Agent] Vojacek provided less than credible testimony regarding how he was alerted to the shooting and how he came to become involved in the investigation unfortunately casts doubt over his testimony as a whole, and specifically with respect to whether anyone ever mentioned the Defendant's name prior to watching the video, and what exactly was discussed in the room while they were all viewing the video. The court notes that [Agent] Vojacek was also untruthful when asked on cross-examination whether he suspected the Defendant's involvement at the time he watched the video. [Agent] Vojacek said that he did "not think of that at the time," even though he admitted on direct examination that he suspected the Defendant's involvement at the time he conducted his Facebook investigation, which occurred prior to the video viewing.

Furthermore, [Agent] Vojacek wavered on the certainty of his identification. The [trial] court notes that, at the time he viewed the video, [Agent] Vojacek was supervising approximately 90-100 parolees, and he had not had any contact with the Defendant since late July because the Defendant had absconded from supervision. Initially, he testified that he did not hesitate in making the identification. However, on cross-examination, he admitted that he had to watch the video four [] times, and that he made the identification after the "second or third time." He also conceded that the identification was not based on the suspect's face, because the face was only visible for "one second." [Agent] Vojacek admitted that the identification was mainly based on the fact that the Defendant was "very close friends" with [Green]. He also testified that "the clothing characteristics" of the Defendant that he saw on Facebook "matched the clothing" that the suspect was wearing in the video. [Agent] Vojacek also conceded that the identification was not based on the Defendant's gait.

Trial Court Opinion, 11/16/18, at 2-6 (citations, emphasis, and some corrections omitted).

After hearing this testimony, the trial court granted the Defendant's motion to suppress Agent Vojacek's pretrial and in-court identifications of the Defendant. Id. at 1. As the trial court explained, it suppressed Agent Vojacek's identification testimony because:

> [Here,] we have a parole officer who found out on the day of the shooting that the Defendant was wanted for questioning in connection with the shooting, who then was specifically contacted by the homicide unit for assistance in making the identification. We have an officer who was less than forthcoming about the nature of his contact with the detectives, who conducted his own Facebook investigation prior to watching the video and who learned what the Defendant was wearing on the night in question. We have a procedure where the video was viewed by multiple people at the same time while there were discussions about what was being depicted on the video. Viewing the video with multiple other individuals in the same room at the same time while discussing the images being shown on the video makes the procedure highly suspect and creates a substantial likelihood of misidentification. Indeed, having multiple people attempt to make an identification together, at the same time, creates the potential for a "mutual reinforcement situation."

> Lastly, we have an identification that was made after four [] viewings, and an identification that was not based on face, appearance[,] or gait, but rather on the mere fact that the Defendant was known to be "very close friends" with the victim and the fact that the suspect was wearing similar clothing to what the Defendant was wearing in the Facebook picture. Accordingly, for all of these reasons, the [trial] court finds that the identification procedure in this case was so impermissibly suggestive that it created a substantial likelihood of irreparable misidentification such that the pretrial identification must be suppressed.

. . .

> [Moreover,] the Commonwealth cannot meet its burden of proving that [Agent] Vojacek had an independent basis for the identification outside of the unduly suggestive identification procedure because [Agent] Vojacek was not an eyewitness to the crime. . . .
>
> The [trial] court also notes that the number and nature of contacts [Agent] Vojacek previously had with the Defendant is irrelevant given that he specifically testified that his identification was not based on the suspect's gait or the "face in and of itself" since the face was only visible for "one second." Thus, because the in-court identification is not based on the observation of the crime in this case, there is no independent basis for the identification, and [Agent] Vojacek will be prohibited from making an in-court identification at trial[, as well].

Id. at 8-10 (citations omitted).

Further, and independent of the above, the trial court ruled that Agent Vojacek's identification testimony was inadmissible because "the Defendant's ability to fairly and effectively cross-examine [Agent] Vojacek as to the reliability of his identification would be substantially handicapped by the nature of his relationship with the Defendant." Id. at 10-11. Thus, the trial court ruled that Agent Vojacek's testimony was inadmissible because the potential for unfair prejudice substantially outweighed the probative value of the testimony. Id.

The Commonwealth filed a timely notice of appeal from the trial court's interlocutory order and, within the notice of appeal, the Commonwealth certified that the order terminated or substantially handicapped its prosecution of the Defendant. Commonwealth's Notice of Appeal, 11/30/18,

at 1-22; see also Pa.R.A.P. 311(d). The Commonwealth raises two claims on appeal:

> 1. Whether the trial court erred in suppressing [Agent] Vojacek's [pretrial] and in-court identifications of [the Defendant]?
>
> 2. Whether the trial court erred in further finding potential unfair prejudice because it was [the Defendant's] status as a parolee and his relationship to [Agent Vojacek] that would limit the [Defendant's] ability to cross-examine or otherwise challenge the identification procedure utilized in the instant case, and therefore, excluding any testimony regarding the circumstances surrounding the identification procedure?

Commonwealth's Brief at 7.

First, the Commonwealth claims that the trial court erred when it suppressed Agent Vojacek's pretrial and in-court identifications of the Defendant. "We review a trial court's order suppressing evidence for an abuse of discretion and our scope of review consists of only the evidence from the defendant's witnesses [during the suppression hearing,] along with the Commonwealth's evidence that remains uncontroverted." Commonwealth v. Miller, 186 A.3d 448, 450 (Pa. Super. 2018) (quotations and citations omitted). "Where the [trial] court's factual findings are supported by the record, we are bound by these findings and may reverse only if the [trial] court's legal conclusions are erroneous." Commonwealth v. Palmer, 145 A.3d 170, 173 (Pa. Super. 2016) (quotations and citations omitted). Relatedly, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their

testimony." Commonwealth v. Gallagher, 896 A.2d 583, 585 (Pa. Super. 2006) (quotations and citations omitted).

"In reviewing the propriety of identification evidence, the central inquiry is whether, under the totality of the circumstances, the identification was reliable." Commonwealth v. Moye, 836 A.2d 973, 976 (Pa. Super. 2003). "A court must assess the reliability of an out-of-court identification by examining the totality of the circumstances." Commonwealth v. Johnson, 139 A.3d 1257, 1278 (Pa. 2016). "A pre-trial identification violates due process only when the facts and circumstances demonstrate that the identification procedure was so impermissibly suggestive that it gave rise to a very substantial likelihood of irreparable misidentification." Id.

Nevertheless, "in-court identifications, despite impermissibly suggestive pre-trial procedures, are admissible if there exists an independent basis for the identifications." Commonwealth v. Abdul-Salaam, 678 A.2d 342, 349 (Pa. 1996). As our Supreme Court has explained:

> To allow an in-court identification following a suggestive pre-trial identification, the Commonwealth must establish, by clear and convincing evidence, that the identification was not a product of the events occurring between the time of the crime and the in-court identification. Therefore, an in-court identification will be permitted if, considering the totality of the circumstances, the in-court identification had an origin sufficiently distinguishable to be purged of the primary taint.
>
> In determining whether an independent basis exists for the identification, the factors to be considered in this determination are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description

of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

Id. (citations and quotations omitted).

The Commonwealth concedes that the pretrial identification procedures were unduly suggestive. See Commonwealth's Brief at 15 ("the Commonwealth will not argue with the [trial] court's conclusion that the identification process was unduly suggestive given the [trial] court's findings of fact and credibility"). As explained above, "[t]o establish reliability in the wake of a suggestive identification, the Commonwealth must prove, through clear and convincing evidence, the existence of an independent basis for the identification." Commonwealth v. Davis, 17 A.3d 390, 394 (Pa. Super. 2011) (quotations, citations, and corrections omitted). An independent basis is established when the identification "resulted from the criminal act and not the suggestive identification procedure." Id. (quotations, citations, and corrections omitted); see also Neil v. Biggers, 409 U.S. 188, 199 (1972) (holding that "unnecessary suggestiveness alone" does not require the exclusion of an out-of-court identification; "the central question [is] whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive").

In this case, Agent Vojacek did not witness the crime. Instead, he identified the Defendant after viewing a surveillance video with two homicide detectives and another parole agent – in a setting and through a process that the Commonwealth agrees was unduly suggestive. Therefore, under the plain

language of the above-quoted standards set forth in Abdul-Salaam and Davis, Agent Vojacek has no "independent basis for [his] identification," as he did not observe the crime and his identification could not be based upon "the criminal act." See id.

Obviously, the facts in the case at bar are unique given that, here, the person who is being asked to make the identification did not witness the crime and, is instead, being proffered because he is familiar with the Defendant. However, even if we broadly ask "whether under the 'totality of the circumstances' the identification was reliable even though the [pretrial identification] procedure was suggestive," it is clear that the trial court did not err when it suppressed Agent Vojacek's identification of the Defendant. See Neil, 409 U.S. at 199.

Here, Agent Vojacek did not witness the crime and was only asked to identify the Defendant in a surveillance video. Moreover, the trial court found, as a fact, that Agent Vojacek's "identification" of the Defendant in the surveillance video was not based upon (what the Commonwealth terms) his "meaningful pre-existing relationship with [the Defendant]" as the Defendant's parole officer. See Commonwealth's Brief at 17. Certainly, the trial court explained:

> [during the suppression hearing, Agent Vojacek] conceded that the identification [of the Defendant] was not based on the suspect's face, because the face was only visible for "one second." [Agent] Vojacek admitted that the identification was mainly based on the fact that the Defendant was "very close friends" with Mr. Green. [Agent Vojacek] also testified

that "the clothing characteristics" of the Defendant that he saw on Facebook "matched the clothing" that the suspect was wearing in the video. [Agent] Vojacek also conceded that the identification was not based on the Defendant's gait.

. . .

[Thus,] the number and nature of contacts [Agent] Vojacek previously had with the Defendant is irrelevant given that he specifically testified that his identification was not based on the suspect's gait or the "face in and of itself" since the face was only visible for "one second."

Trial Court Opinion, 11/16/18, at 6 and 10 (citations omitted).

These factual findings are binding on this Court and establish that Agent Vojacek's identification of the Defendant was based upon the Defendant's mere association with one of the murder victims and clothes that Agent Vojacek observed the Defendant wearing on social media. Neither of these factors support the Commonwealth's claim that Agent Vojacek's identification was based upon his "meaningful pre-existing relationship with [the Defendant]" and these tenuous factors do not "prove, through clear and convincing evidence, the existence of an independent basis for [Agent Vojacek's] identification" of the Defendant. Commonwealth's Brief at 19; Davis, 17 A.3d at 394.

Therefore, we conclude that the trial court did not err when it suppressed Agent Vojacek's pretrial and in-court identifications of the Defendant, as they are unreliable. See Neil, 409 U.S. at 199. Moreover, given our disposition, the Commonwealth's second claim on appeal is moot,

as this claim merely attacks the trial court's alternate reason for excluding Agent Vojacek's in-court identification of the Defendant.

Order affirmed. Jurisdiction relinquished.

Judge Shogan joins.

Judge Lazarus notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/23/2020